# Exhibit A

m., Pg. 2

```
 1    IN THE DISTRICT OF THE UNITED STATES OF AMERICA
          FOR THE SOUTHERN DISTRICT OF ILLINOIS
 2    _____
 3    D.W.K., Jr. and parents Mary &    )
      Daniel Kaleta,                    )
 4                                      )
                                        )
 5              Plaintiff(s),   ) Case No. 14-847-NJR-SCW
                                        )
 6        vs.                           )
                                        )
 7                                      )
                                        )
 8    ABBOTT LABORATORIES, INC.,        )
                Defendant(s).           )
 9    _____ )
10                     TRIAL DAY 1
11                    (a.m. session)
12
13    BE IT REMEMBERED AND CERTIFIED that heretofore on 03/02/2015,
14    the same being one of the regular judicial days in and for the
15      United States District Court for the Southern District of
16      Illinois, Honorable Nancy J. Rosenstengel, United States
17      District Judge, presiding, the following proceedings were
18      recorded by mechanical stenography; transcript produced by
19                         computer.
20
21
22
23    REPORTED BY: Molly N. Clayton, RPR, FCRR, Official
      Reporter for United States District Court, SDIL, 750 Missouri
24    Ave., East St. Louis, Illinois 62201, (618)482-9226,
                  molly_clayton@ilsd.uscourts.gov
25
```

```
 1                    APPEARANCES:
 2         John Eddie Williams and John T. Boundas of Williams
      Kherkher Hart Boundas LLP, 8441 Gulf Freeway, Suite 600,
 3    Houston, TX 77017; and,
 4         Phillip Sampson of Bracewell & Giuliani LLP, 711
      Louisiana, Suite 2300, Houston, TX 77002; and,
 5
           Kenneth T. Fibich of Fibich Hampton Leebron Briggs &
 6    Josephson, LLP, 1150 Bissonnet, Houston, TX 77005; and,
 7
 8         FOR DEFENDANT: Dan H. Ball of Bryan Cave - St. Louis, 211
      North Broadway, One Metropolitan Square, Suite 3600, St. Louis,
 9    MO 63102; and,
10         Paul F. Strain and B. Michael MacWilliams of Venable LLP,
      750 East Pratt St, Suite 900, Baltimore, MD 21202
11
```

---

Day 1-a.m., Pg. 3

```
 1           INDEX OF WITNESS EXAMINATION
 2           DX    CX    R-DX    R-CX
 3    No witness testimony.
 4
 5
 6               INDEX OF EXHIBITS
 7    EXHIBIT       DESCRIPTION       Id'D    Rcv'd
 8    No exhibits identified or received.
 9
10
11               MISCELLANEOUS
12                                         PAGE
13    Motions                               19
      Venire 1-29, voir dire by Court       30
14    Challenges for cause                  66
      Venire 1-29, voir dire by Plf         70
15    Venire 1-29, voir dire by Dft        102
      Challenges for cause                 137
```

Day 1-a.m., Pg. 4

1                (Court convened)
2    (Following proceedings held outside presence of Venire 1-29:)
3         THE CLERK: D.W.K., Jr., et al., versus Abbott
4    Laboratories, Inc., Case Number 14-cv-847, is called for the
5    first day of civil jury trial.
6         Will the parties identify themselves for the record?
7         MR. FIBICH: Good morning, your Honor, Tommy Fibich,
8    on behalf of the plaintiffs.
9         THE COURT: Good morning, Mr. Fibich.
10        MR. WILLIAMS: Good morning. John Eddie Williams,
11   plaintiffs.
12        THE COURT: Mr. Williams.
13        MR. BOUNDAS: John Boundas, for the plaintiffs.
14        THE COURT: Good morning, Mr. Boundas.
15        MR. SAMPSON: Phillip Sampson, plaintiffs, your Honor.
16        THE COURT: Good morning.
17        MR. BALL: Dan Ball, for Abbott.
18        THE COURT: Good morning, Mr. Ball.
19        MR. MacWILLIAMS: Good morning, your Honor. Michael
20   MacWilliams for Abbott.
21        THE COURT: Good morning, Mr. MacWilliams.
22        MR. STRAIN: Good morning, your Honor, Paul Strain,
23   for the defense.
24        THE COURT: Good morning, Mr. Strain.
25        Well, good morning, everyone, and welcome. I hope

| | |
|---|---|
| 1   medicines. Most of them are completely useless for the kind | 1   other medications. He knew that. He knew it because the |
| 2   of epilepsy Mrs. Kaleta has, unfortunately. | 2   warning label was effective. He also testified that he was |
| 3           In fact, there's a doctor who's going to come in | 3   well aware and told Mrs. Kaleta the risk occurs in the first |
| 4   here to testify for the plaintiffs, and he's going to admit | 4   couple of weeks of pregnancy, that Depakote had special |
| 5   that there are only two others that have even a theoretical | 5   birth defect risks that other drugs didn't have. |
| 6   possibility of helping Mrs. Kaleta back at the time she was | 6           And he knew all about what spina bifida is and |
| 7   pregnant with D▊▊▊, only two others. They're called | 7   described it in -- when he was warning Mrs. Kaleta, |
| 8   Lamictal and Topamax. And you might have to double them up, | 8   described to her spina bifida in very graphic terms I'm not |
| 9   which, of course, is bad to take two rather than one. | 9   even going to repeat here; in very graphic terms just how |
| 10          But just to show you what the doctors would have to | 10  bad spina bifida could be. So he knew it and he told her, |
| 11  choose from, those two drugs, the FDA categorized as a C. | 11  and he'll testify to that when we submit his testimony. |
| 12  So if a doctor felt, *Should I try Lamictal? Should I try* | 12          And Dr. McGonagle, her neurologist in 1999, has |
| 13  *Depakote?* and wanted to know which one has more risk, the | 13  testified that he also knew Depakote had special risks and |
| 14  FDA's telling them which one has more risk. | 14  greater birth defect risks than other epilepsy medicine. |
| 15          You look at the Depakote warning label. You look | 15  There's no mistake about this. These doctors knew. And one |
| 16  at the Lamictal warning label, and then you know. You know | 16  of the reasons they knew is -- obviously, Dr. McGonagle said |
| 17  what the relative risk is. There's no, there's just no | 17  he knew it from the get-go, in fact, when he got out of |
| 18  mystery about it. So -- and that was in the warning label | 18  medical school. But one of the reasons he knew was because |
| 19  from the time Depakote began, so way back. All the doctors, | 19  of the warning label and how Abbott took the responsibility |
| 20  whoever prescribed it, dealt with Mrs. Kaleta with Depakote, | 20  seriously. |
| 21  knew all this. | 21          Now, one of the things that happened -- and maybe |
| 22          For example, you heard the name Dr. Taber. | 22  the most important thing -- between when Dr. Taber |
| 23  Dr. Taber -- you heard it this morning and I mentioned it | 23  prescribed Depakote for Mrs. Kaleta and when Dr. McGonagle |
| 24  again a moment ago. Dr. Taber testified that he knew | 24  prescribed Depakote for Mrs. Kaleta, one of the things that |
| 25  Depakote had a spina bifida risk that was not present in | 25  happened was the FDA made an important decision about |

|                                   Vol. III, Pg. 681 |                                   Vol. III, Pg. 682 |
|---|---|
| 1   Depakote, and that decision was to require Abbott to have a | 1   warning when the FDA said to in 1996 in its physician's |
| 2   black box warning label for birth defects, black box -- FDA | 2   warning label. |
| 3   black box birth defect warning. The black box warning comes | 3           That's tiny, but I want you to see the language. |
| 4   right out of FDA regulations. It is the strongest warning | 4           If I may put that up, Your Honor? |
| 5   that FDA regulations allow, the strongest warning that FDA | 5           *THE COURT:* You may. |
| 6   regulations allow. | 6           *MR. STRAIN:* I understand it won't block your view. |
| 7           There are, in FDA-approved warning labels -- and | 7           *THE COURT:* No. That's fine. |
| 8   you all know that pharmaceutical companies aren't free | 8           *MR. STRAIN:* What we're looking at is the FDA's |
| 9   agents with their warning labels. The FDA is right involved | 9   black box warning for birth defects. The first word is |
| 10  and has to approve the warnings and all the rest. The | 10  "teratogenicity." I had to learn how to pronounce that, |
| 11  FDA-approved warning labels have different categories and | 11  "teratogenicity." It's a doctor's word for birth defects. |
| 12  levels of warnings, and one of them -- it's a section right | 12  To a doctor, that means birth defects. |
| 13  in the warning labels. One of them is called "Precautions", | 13          And you see how it says -- you see how it says, |
| 14  and a whole lot of drugs have precautions for the doctors | 14  teratogenic effects -- that means birth defects -- such as; |
| 15  about that drug. | 15  not only, but such as neural tube defects. That's a general |
| 16          And the next level up, the higher level up is | 16  term for spina bifida. And then so there's no mistake, |
| 17  warnings themselves. They're called warnings themselves. | 17  spina bifida itself. That's what the FDA said to put in the |
| 18  And many drugs have warnings as well; have precautions and | 18  black box warning for Depakote. |
| 19  warnings. Above that, sitting above that is the strongest | 19          And I said the FDA owns the black box warning. |
| 20  warning that the FDA requires to be right up front. Right | 20  That's what I mean. Because what the FDA does when it's the |
| 21  at the start of the warning label is the FDA black box | 21  black box warning is, the FDA says, *This is the language.* |
| 22  warning. | 22  *You have to do it. You have to do that and only that.* |
| 23          Now, that black box warning is not only the FDA's | 23  *Don't play with those words. Don't change them. That's it.* |
| 24  strongest allowed warning category. That FDA black box | 24  *Carve it in stone. That's what it has to be.* |
| 25  warning is owned by the FDA. Abbott put that black box | 25          The FDA owns the black box warning. And what I've |

1 medicine?
2 **A.** Pediatrics, which is the first one; pubic health or
3 preventive medicine; and third, genetics.
4 **Q.** Now, you have been a pubic health officer?
5 **A.** Yes, sir.
6 **Q.** And you served in a branch of the military, I guess. What
7 rank did you achieve?
8 **A.** Well, we call it -- it is the pubic health service, and we
9 call it a uniform service. It is not a gun-toting military,
10 okay. But it is Public Health Service. It grew up providing
11 medical care to merchant seaman, is where it grew up, and,
12 therefore, the uniforms look like Navy uniforms. But, yes, I'm
13 a retired captain in the United States Public Health Service.
14 **Q.** Did you have to wear a uniform when you went to work every
15 day?
16 **A.** Not every day. But once Dr. Koop became the Surgeon
17 General, he thought that we ought to wear uniforms, and so the
18 order came down that we should wear uniforms. And on every
19 Wednesday at CDC, that was the standard, we wore uniforms. You
20 could wear them any day, but I usually wore mine just on
21 Wednesdays.
22 **Q.** Okay. How many years did you serve in the Pubic Health
23 Service?
24 **A.** For 30 years.
25 **Q.** What made you to decide to serve in the Pubic Health

Direct Examination - Oakley, Godfrey

1  time.
2  **Q.** Okay. Now, in all of that, why didn't you finish college?
3  **A.** Well, he's referring to the fact that I only went to
4  college for three years. And I -- at that time, there was
5  some -- if you did well enough in college, you might be
6  admitted to medical school, and I was fortunate enough not only
7  to be admitted to medical school, but I got a full scholarship
8  to go to medical school, which was really a lucky day for me
9  and my family.
10 **Q.** You and I are southern boys, and our moms taught us to be
11 modest, but I want to ask you about some things. Put modesty
12 aside because I want this jury to appreciate what accolades you
13 have received over the years. So I'm going to embarrass you a
14 little bit. Did you start wining awards in medical school?
15 **A.** Um, well, I won a scholarship to get there. So that's for
16 sure.
17 **Q.** And if I were to go through your CV, I've seen dozens of
18 awards you have received over the years, correct?
19 **A.** Yes.
20 **Q.** And have you received lifetime achievement awards?
21 **A.** Yes. Spina Bifida Association. And I won the Watson prize
22 at the CDC when I left, which was essentially a similar kind of
23 award.
24 **Q.** You are being modest. The Watson prize is given to the
25 highest -- it is for distinguished service for the CDC,

```
 1   correct?
 2   A.  That is correct.
 3   Q.  It's the highest award they give?
 4   A.  That is correct.
 5   Q.  You have also been presented lifetime achievement awards by
 6   Spina Bifida Association, March of Dimes?
 7   A.  Yes.
 8   Q.  You are being modest.
 9   A.  Yes.
10   Q.  Okay.  Have you ever been named person of the week by ABC
11   News, Peter Jennings?
12   A.  Well, yes, I was.  And it was an very, very interesting
13   day.  And so, yes, that's true I was.  They made me sign my
14   name, which is almost illegible, and it was shown on national
15   television as I wrote my name out.
16   Q.  What is the National Institute of Health?
17   A.  The National Institute of Health is one part of the United
18   States -- or the Department of Health, Education, and Welfare.
19   And it is the unit that is in charge of funding biomedical
20   research.
21   Q.  Were you elected -- you have been elected by your peers
22   into what group?
23   A.  Do you mean the Institute of Medicine?
24   Q.  Thank you for correcting.
25       What is the Institute of Medicine?
```

Direct Examination - Oakley, Godfrey

1  **A.**  So the Institute of Medicine is a rather elite body of
2  people interested in medicine that was formed to help the
3  government make difficult decisions about many different
4  things.  And the advantage of the Institute of Medicine is
5  that -- and its process is that it allows a very rigorous and
6  unbiased review of evidence.  And they put that together and
7  try to interpret it so people use it in the Army or in the VA
8  or others can make the proper decisions from that.  It's been
9  very visible, for example, at reviewing the data on the safety
10 of vaccines that have been in the news a lot.
11 **Q.**  Common on.  How important is it that people receive an
12 invitation by their peers to join the Institute of Medicine?
13 **A.**  Well, it's clearly the biggest honor that I've ever had,
14 was to be elected to the Institute of Medicine.
15 **Q.**  And that's a very limited society, correct?
16 **A.**  About 50, 60 people a year out of the whole country are
17 elected.  My mother was very proud.
18 **Q.**  Okay.  In addition to that, you have written extensively?
19 **A.**  Yes, sir.
20 **Q.**  You have been an author of many papers over the years.
21 **A.**  That is correct.
22 **Q.**  And you have been involved in some societies, and I want to
23 ask you:  The International Clearinghouse for Birth Defects,
24 have you been involved with the International Clearinghouse for
25 Birth Defects?

1  **A.**  Yes, I have been.  I was involved with it for many years,
2  and people who worked for me at CDC after that continued to be
3  involved in it.  It was an organization, a rather small
4  organization, but it was an organization of birth defects
5  monitoring programs.
6     And we had one of those in Atlanta, and that's what I
7  worked on when I first went there.  And what we did was to go
8  to every hospital in Atlanta, and if a baby -- or if a woman
9  had a baby with a birth defect, we would count that baby, and
10 we would find out information about where they lived.
11    And later some of the those babies would be -- some of
12 those women would be interviewed, in trying to determine what
13 exposures might they have had in pregnancy that might have
14 explained the cause of this birth defect.
15 **Q.**  By the way, the International Clearinghouse for Birth
16 Defects, the relevance of that was in 1982.  Is that the -- we
17 have heard about Dr. Robert from Lyon.  Was Dr. Robert a member
18 of the international clearinghouse?
19 **A.**  So the members are the programs, okay.
20 **Q.**  Oh, okay.
21 **A.**  But the programs are represented, and the people that come
22 to the meeting were people like me.  I represented the Atlanta
23 birth defects surveillance system and Dr. Robert represented
24 the Lyon system.  Yes.
25 **Q.**  Well, who was the head of International Clearinghouse for

1   Birth Defects back in 1982?
2   **A.** I was the president that year. So I was president -- and I
3   was president another year, but that year I was president of
4   that organization.
5   **Q.** We are going to come back to that in detail, if we can
6   Doctor. But I'm going to move on.
7      Have you served on other societies? Like the Teratology
8   Society, have you served them?
9   **A.** Yes. And to restate what is teratology and teratogens,
10  teratology -- it is a terrible word. And we have tried to
11  change the name of this organization, but we haven't gotten it
12  changed yet. But "tera" comes from monster, which was
13  animals -- baby animals with very bad birth defects is sort of
14  where it comes from.
15     And so, yes, I was the president of that organization also.
16  **Q.** Thirty years in public health, you retired in what year?
17  **A.** 1998.
18  **Q.** And since then, what have you done?
19  **A.** Since then, my primary focus has been on trying to prevent
20  spina bifida that's caused by there not being enough folic
21  acid.
22  **Q.** I'm going to get to that. I don't want to interrupt you.
23  By the way, this is your first time ever to testify, isn't it?
24  **A.** It is. I'm a bit of a rookie, so I hope I behave.
25  **Q.** I bet you do.

Direct Examination - Oakley, Godfrey

```
 1          Okay.  So, Dr. Oakley, are you a professor of medicine?
 2    A.    Well, I'm a professor of pediatrics, and I am a professor
 3    of epidemiology.  That's where my main appointment is, a
 4    research professor of -- of epidemiology.  My main point is in
 5    the school of public health.
 6    Q.    And at what university?
 7    A.    At Emory University, and the school is called the Rollins
 8    School of Public Health of Emory University.
 9    Q.    And you have received awards there?
10    A.    Yes.
11    Q.    And you have overseen -- you have mentored students as they
12    get their master's degrees and advanced training in those
13    areas.
14    A.    That is correct.
15    Q.    And if you would, you live in what city?
16    A.    I live in Atlanta, Georgia.
17    Q.    And your age, if I could?
18    A.    Kind of personal, isn't it?
19          Okay.  I'm 74.  I'll be 75 in June.
20    Q.    You told me 74 1/2.
21    A.    Yes, sir, 74 1/2.
22    Q.    Okay.
23    A.    I'm proud of it, by the way.
24    Q.    So if I may, I want to talk to you, you mentioned folic
25    acid.
```

Direct Examination - Oakley, Godfrey

1  *missing arms, missing parts of their legs, this is a*
2  *bigger deal than that.*
3          There is no cure for that, Your Honor.
4          THE COURT: Okay. Well, here's -- here is another
5  thing that I think we could do and that is, I could
6  individually poll the jurors to ask if they even know what
7  Thalidomide is. Some people, of a certain age, don't even
8  know what it is. And I could bring them in one at a time
9  and ask them if they heard it, if they know what it is.
10 If they know what it is, do they understand that it has
11 nothing to do with this case and that, could they
12 disregard that and decide the case on the evidence and not
13 on any reference that has been made to that drug.
14         We have 12 jurors. So, if we have a juror who
15 says, *Yes, I know what it is and I can't put it out of my*
16 *mind*, we could let that juror go.
17         MR. STRAIN: I'm afraid, Your Honor, that that
18 would further accentuate the prejudice because of the 12
19 jurors, if one knows and then is released, the 11
20 remaining will have heard it, with good intentions from
21 Your Honor, and that would accentuate the problem. So, I
22 would ask that we not do that, Your Honor.
23         MR. BOUNDAS: Your Honor, from the plaintiff's
24 perspective, and I hope I'm not misspeaking the way it,
25 the sequence of how it happened, was I think that Dr.

1           MR. BOUNDAS:  Your Honor, if I can address that?

2           THE COURT:  You can respond briefly.

3           MR. BOUNDAS:  Thank you.  I think Mr. Strain hit
4  on the point there.  They're arguing, Thalidomide, whether
5  or not it is relevant, we can have a debate about it,
6  okay?  But I haven't heard anything that -- let's go back
7  to the case law -- that they can no longer get a fair
8  trial because this has so infected the jury's ability to
9  address the evidence.

10          In other words, if these people now, because they
11 heard Mr. -- Dr. Oakley inadvertently reference
12 Thalidomide, even if irrelevant, is so prejudicial and so
13 unfair that we cannot conduct the rest of this three-week
14 trial because of what Dr. Oakley -- and I don't think
15 there's any dispute -- inadvertently stated?

16          Here's what's happening:  Abbott is making an
17 assumption that somebody saying Thalidomide in the United
18 States of America or, better yet, in the St. Louis area,
19 pops something into someone's mind that makes it so, it
20 clouds them so much that they can no longer weigh the
21 evidence fairly, that I suggest, Your Honor, is an
22 assumption.  It -- I bet you, if we polled everyone -- you
23 know, I was talking to Mr. Sampson.  He didn't know what
24 Thalidomide was before we got into this litigation.

25          THE COURT:  Well, that's why I asked, that's why I

```
 1   asked about polling the jury because I, I polled my law
 2   clerks and they don't know what it is.  So, a lot of
 3   people don't.
 4           So, well, I'm going to take the motion under
 5   advisement.
 6           Just to be clear, you do not want a curative
 7   instruction at this time?
 8           MR. STRAIN:  I do not, your Honor, for the reason
 9   I stated.  Thank you.
10           THE COURT:  And you do not want me to poll the
11   jury at this time?
12           MR. STRAIN:  I do not, for the reason I stated,
13   Your Honor.
14           THE COURT:  Okay.  Well, I'm going to take the
15   motion under advisement.
16           Dr. Oakley, you understand, no reference to
17   Thalidomide?
18           THE WITNESS:  I understand.
19           THE COURT:  Okay.  And we'll proceed.
20           MR. STRAIN:  As Your Honor has it under
21   advisement, I know you will but, directing attention to,
22   among other things, to page 34, with the reference to
23   *missing arms and parts of legs due to Thalidomide* --
24   quoting from the rough -- *this is a bigger deal than that*.
25           THE COURT:  Okay.
```