# EXHIBIT 4

IN THE CIRCUIT COURT OF MISSOURI
CITY OF ST. LOUIS, 22nd JUDICIAL CIRCUIT, DIVISION 13
Honorable Steven R. Ohmer, Judge

MIASIA BARRON, ET AL.
  Plaintiff, )
v. ) No. 1222-CC02479-01
ABBOTT LABORATORIES, INC.,
  Defendant. )

**VOLUME 7A**
**TRIAL TRANSCRIPT**
**MAY 18, 2015**

APPEARANCES

John E. Williams, Esq.
John T. Boundas, Esq.
 on behalf of the Plaintiff.
Paul Strain, Esq.
Dan Ball, Esq.
 on behalf of the Defendant.

JENNA HIGGINS, CCR #998G, CSR (MO & IL)
OFFICIAL COURT REPORTER
CITY OF ST. LOUIS
TWENTY-SECOND JUDICIAL CIRCUIT

1166

1     MONDAY, MAY 18, 2015
2    **THE COURT:** Good morning folks. Be seated.
3  Welcome back. Everybody have a good weekend?
4    (The jury responds in unison.)
5    **THE COURT:** Excellent. Refreshed and ready
6  to go back to work? All right. Very good. And
7  Counsel, you may continue.
8    **MR. BOUNDAS:** Thank you, Your Honor. The
9  plaintiffs call Dr. Robert Jacoby.
10   **ROBERT JACOBY, M.D.,**
11 having been first duly sworn by Honorable
12 Steven Ohmer, testified as follows:
13   **THE COURT:** You may inquire.
14   **MR. BOUNDAS:** Thank you. Good morning
15 everyone. Everyone have a good weekend?
16   (The jury responds in unison.)
17    DIRECT EXAMINATION
18 BY MR. BOUNDAS:
19  Q. Dr. Jacoby, introduce yourself to the jury,
20 please.
21  A. I'm Dr. Robert Jacoby, a neurologist in
22 Minneapolis, Minnesota.
23  Q. And, Doctor, I want to talk about why you're
24 here, your role in the case. You know who M.S.
25 ▇▇▇▇ is, correct?

1167

      INDEX
ROBERT G. JACOBY, M.D.
 Direct Examination by Mr. Boundas..........1166
 Cross-Examination by Mr. Strain............1233

1   A. I do.
2   Q. You have met her?
3   A. I have.
4   Q. When?
5   A. Many, many years ago. I remember her in a
6  stroller. So quite a few years ago.
7   Q. And you treated her birth mother, Tiffany
8  Vititoe?
9   A. Yes, I did.
10  Q. Okay. What did you treat her for?
11  A. I treated her for epilepsy.
12  Q. Okay. And what years did you treat her?
13 What was the span?
14  A. Around 2001 until now.
15  Q. Okay. You're still treating her?
16  A. I am.
17  Q. She's still your patient?
18  A. Yes, she is.
19  Q. By the way, when is the last time you saw
20 her?
21  A. About two weeks ago.
22  Q. You said you're a neurologist. Why don't
23 you tell the jury, what does that mean, what do you
24 do?
25  A. We do everything basically. We deal with

1  your decision to prescribe this drug?
2     A.  Again, the general thought was antiepileptic
3  drugs have a risk.  The risk with Depakote you need to
4  be aware of is spina bifida.
5     Q.  Okay.  And then it mentions other congenital
6  anomalies and lists them, craniofacial defects,
7  cardiovascular, compatible and incompatible with life
8  have been reported.  Sufficient data to determine the
9  incidence of these congenital anomalies are not
10 available.  What does that mean?
11    A.  Can you move it up?
12    Q.  So now we're in this paragraph.
13    A.  It says not only do we have spina bifida to
14 worry about, but there is also other congenital
15 abnormalities, but there is not enough data to make
16 any comments basically.
17    Q.  So what was your understanding about the
18 communication about whether or not Abbott had
19 sufficient data at that time?
20       MR. STRAIN:  Objection.  I'm sorry.  Form
21 and foundation, Your Honor.
22       THE COURT:  Overruled.
23    A.  Can you repeat the question.
24    Q.  (By Mr. Boundas)  Are they telling you they
25 had sufficient data at that time?

1222

1     A.  No.  They don't.
2     Q.  Okay.  Do you -- by the way, Doctor, do you
3  know what Abbott knew in 2002 versus what you knew?
4     A.  I do not.  I knew what I knew.  I didn't
5  know what Abbott knew.
6     Q.  Sure.  Now, this next sentence I want to
7  zoom in on, okay.  It says the higher incidence of
8  congenital anomalies in antiepileptic drug treated
9  women with seizure disorders cannot be regarded as a
10 cause and effect relationship.  What does that mean to
11 you?
12    A.  Basically means they didn't know why women
13 with a seizure disorder treated with antiepileptic
14 drugs had a higher incidence rate.  They weren't sure
15 whether it was because of the cause of genetics of the
16 epilepsy or whether it was related to the drugs
17 themselves or something else.  They couldn't do a
18 cause and effect.  Like say if I give you aspirin, a
19 big bottle of aspirin, and the next day you get an
20 ulcer, that is a cause and effect.  We didn't have
21 that information.
22    Q.  Do you know what information Abbott knew at
23 that time about the cause and effect relationship?
24    A.  No.
25       MR. STRAIN:  Objection.  Same basis.

1223

1       THE COURT:  Sustained.
2     Q.  (By Mr. Boundas)  Now, Doctor, taking
3  this -- you have read this label?
4     A.  Yes.
5     Q.  Back then and I assume to prepare for
6  talking to these people I hope?
7     A.  Yes.
8     Q.  In totality, the totality of this label, in
9  your opinion was it advising that Depakote had a
10 higher or lower risk of birth defects than the other
11 drugs?
12       MR. STRAIN:  Objection, Your Honor.  This is
13 not -- this is factual testimony.
14       THE COURT:  Sustained.
15    Q.  (By Mr. Boundas)  What was your
16 understanding of the totality of this warning?
17       MR. STRAIN:  Same objection, Your Honor.
18       THE COURT:  You may answer that question.
19    A.  Basically the warning was a generic warning.
20 Basically it said Depakote can cause birth defects and
21 all the other medicines can cause birth defects and
22 women who have babies -- women with seizures who have
23 babies can have birth defects, so there is really
24 nothing specific at all to Depakote.
25    Q.  (By Mr. Boundas)  Doctor, was -- I think we

1  looked at it, but I just -- was there anything in the
2  label regarding whether you should try alternative
3  therapies in women of childbearing age?
4     A.  Not that I'm aware of.
5     Q.  Now, Doctor, let me ask you this.  You're
6  not an expert in the FDA, right?
7     A.  I am not.
8     Q.  Okay.  Do you have any knowledge of the
9  regulations about when a drug company is supposed to
10 change their label or how the FDA plays into it?
11    A.  I do not, no.
12    Q.  Okay.  But you do rely on this finished
13 product?
14    A.  Yes.
15    Q.  Okay.  Now, Doctor, I want to ask you,
16 treating this patient at the time you thought Depakote
17 was the best drug for her?
18    A.  I did.
19    Q.  Okay.  Now, we've just looked at the label,
20 okay.  And I want to ask you, Doctor, if in 2002 you
21 had been advised that there was information that
22 Depakote had a greater birth defect danger than the
23 other drugs, how would that have affected your
24 decision to prescribe the medication in this case?
25       MR. STRAIN:  Objection, Your Honor.  Form

```
 1  acid, correct?
 2      A.  That's correct.
 3      Q.  And even if she had taken the folic acid, of
 4  course you knew that folic acid wouldn't be a panacea
 5  for spina bifida, correct?
 6      A.  Yes.  We thought it might reduce the risk.
 7      Q.  But it wouldn't be a panacea, it wouldn't
 8  eliminate the risk?
 9      A.  No.
10      Q.  No, I'm right?
11      A.  Yes.  You're right.
12      Q.  That was your belief at the time?
13      A.  That's correct.
14          MR. STRAIN:  We'll let it end with your
15  saying, no, I'm right.  That's all I have, Doctor.
16  Thank you very much.  Thank you for coming down from
17  Minnesota.
18          THE COURT:  I assume --
19          MR. BOUNDAS:  I have redirect.  It is your
20  pleasure on lunch.
21          THE COURT:  How long do you anticipate?
22          MR. BOUNDAS:  Ten, 15 minutes.
23          THE COURT:  I think we'll take our lunch
24  break.  Please step down.
25          THE WITNESS:  Thank you.
```

```
 1          THE COURT:  Ladies and gentlemen, let's
 2  close the notebooks and not talk about this case.  I
 3  -- is the lunch here do you know?  You haven't heard.
 4  All right.  It should be.  If it is not, it should be
 5  here shortly.  So let's -- we'll be in recess until
 6  2:00 o'clock.  Have a good lunch, folks.
 7          THE SHERIFF:  Court's in temporary recess
 8  until 2:00 p.m.
 9          (The Court duly admonished the jury pursuant
10      to MAI-CR 300.04 and a lunch recess was
11      taken.)
```

## CERTIFICATE

I, Jenna L. Higgins, Certified Court Reporter, do hereby certify that I am an official court reporter for the Circuit Court of the City of St. Louis; that on May 18, 2015, I was present and reported all the proceedings had in the case of Miasia Barron, et al. vs. Abbott Laboratories, Inc., Cause No. 1222-CC02479-01.

I further certify that the foregoing pages contain a true and accurate reproduction of the proceedings.

_Jenna L. Higgins_
Jenna L. Higgins, CCR 998(G)
CSR (IL and MO)

TRANSCRIBED: May 18, 2015