Patti Nemeth, M.D.

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF ILLINOIS
 3                        - - -
 4     IN RE DEPAKOTE:            :
 5     RHEALYN ALEXANDER,         :
 6     et al.,                    : No.
 7          Plaintiffs,           : 12-52-NJR-SCW
 8     vs.                        :
 9     ABBOTT LABORATORIES,       :
10     INC.,                      :
11          Defendant.            :
12
13         DEPOSITION UNDER ORAL EXAMINATION OF
14                  PATTI NEMETH, M.D.
15                     9:00 a.m.
16               Rio Rancho, New Mexico
17
18                       - - -
19       REPORTED BY:  DANA SREBRENICK, CRR, CLR
20                       - - -
21
22             Golkow Technologies, Inc.
            877.370.3377 ph | 917.591.5672 fax
23                  deps@golkow.com
24
25
```

1      So that was probably the one that I would
2  pick and it worked for -- oftentimes when we see a
3  patient, certainly urgently, we don't really know
4  what kind of seizures they have.  We don't have a
5  history.  They're unable to give it.  And we don't
6  have the diagnostic tests.  So Keppra is used for
7  all types of seizures and so we often start with
8  that.
9      MR. OTT:  Let him ask another question so
10 we get back on.
11     THE WITNESS:  Okay.
12  BY MR. BROSS:
13   Q.   So is it fair to say that you choose the
14 drug or the treatment that's most efficacious with
15 the least risks?
16     MR. KLATT:  Objection, form.
17   A.   Yes.  That would be true, but we also --
18 when I was a neurology resident, we kind of had a
19 scripted idea that generalized seizures would be
20 treated by one thing and absence should be treated
21 by another and complex partial by another; but as
22 I say, in clinical practice, you sort of evolve
23 into your approach to drugs.
24     Like, for example, Dilantin is one of the
25 most used drugs, but it had a large number of

1   potential side effects so it was rarely the first
2   choice.  And epileptologists will pick some of the
3   newer drugs that they have a better understanding
4   of.
5      BY MR. BROSS:
6      Q.   So it sounds like what you just told me
7   is that if you have a class of drugs, the
8   relative -- relevant risks and benefits among
9   those drugs in a similar class are important for
10  you to consider?
11     A.   Yeah, yes.  The class of drug is -- or --
12  is important particularly in things like
13  pregnancy.
14     Q.   So when you're looking at a drug to use,
15  you look at all factors, all -- the totality of
16  the drug's risks or factors?
17     A.   I do.
18     Q.   And in your practice, if a company knew
19  that a drug was more dangerous for a certain
20  population, would you expect them to let you know
21  that?
22          MR. KLATT:  Objection, form.
23     A.   Well, I do know that because just in
24  practice, you're reading and you know -- you know
25  that Depakote has a higher risk for malformations.

1  Q.  And I believe you actually touched on
2  this earlier, too, I don't want to -- I'm going to
3  try to not repeat questions I ask, so that's why
4  I'm pausing, so if you'll excuse me.  But I think
5  you said when you place a patient on a medication,
6  it's a decision that's made by both you and your
7  patient?
8  A.  That's correct.
9  Q.  Can you describe informed consent, what
10 it means to you?
11 A.  That's where a patient agrees to be -- to
12 treatment based on their knowledge of the risks
13 and benefits as really discussed by the physician,
14 and then the physician, of course, based on his or
15 her information or knowledge.
16 Q.  Then would you agree that it's -- and I
17 think you would -- the responsibility of the
18 physicians to give the patients the knowledge or
19 the information they've been provided?
20 A.  Yes.
21 Q.  And if when you were prescribing Depakote
22 to Ms. Sansone in 2004 you'd been provided
23 additional information about the risks of birth
24 defects with the use of Depakote, you would have
25 shared that with Ms. Sansone?

1   she couldn't take them, I would still -- I would
2   talk to her about it.  And that's what we did.
3       BY MR. BROSS:
4       Q.   And I guess my question's a little
5   different.
6       A.   Okay.
7       Q.   If -- you knew about the risks that you
8   knew at that time, but if you'd known the risks
9   were four-fold greater, would you have shared that
10  with Ms. Sansone?
11          MR. KLATT:  Objection, form, foundation.
12          MR. OTT:  He's asking if you had other
13  information, did you talk to your patient about
14  it.
15      A.   Yes, I talked to the patient about new
16  information if it applies to them.
17      Q.   An important part of the process then is
18  to discuss the various therapies and the benefits
19  of the therapies and the risks of the therapies
20  and to allow the patient to -- to have a say in
21  the informed consent process, if you will?
22      A.   That's right.
23          MR. KLATT:  Objection, form.
24      Q.   And is it fair to say that after you
25  discuss things with your patients, ultimately it's

```
 1   their decision to decide what to do?
 2       A.   Yes.
 3       Q.   So if they -- if they don't want to take
 4   something, you respect that decision?
 5       A.   Yes.
 6       Q.   I mentioned sales reps briefly.  Do you
 7   know if they visited you about Depakote?
 8            MR. OTT:  That would be an Abbott rep.
 9            MR. BROSS:  It would have been an Abbott
10   rep, sorry.
11       A.   I don't recall.
12     BY MR. BROSS:
13       Q.   Do you recall if they ever left you any
14   studies or documents?
15       A.   Well, I just don't recall in a general
16   way.  I know that the Depakote reps came because
17   we would get samples in our closet, but I don't --
18   I just don't remember any particular conversation
19   or --
20       Q.   Do you know if they ever left any patient
21   leaflets or any handout materials when they left
22   you those samples in the closet?
23       A.   I couldn't say for sure for that
24   particular drug, but we did get them.  They would
25   give us promotional pages about their drugs.  I
```

```
 1            MR. KLATT:  Objection, form.
 2      A.    I would say yes, but -- yes.
 3      BY MR. BROSS:
 4      Q.    "Then, therefore, antiepilepsy drugs
 5  should be administered to women of childbearing
 6  potential only if they are clearly shown to be
 7  essential in the management of their seizures."
 8            Does that again sound like a sort of
 9  class warning, if you will, disclosure?
10            MR. KLATT:  Objection, form.
11      A.    I guess -- I think it sounds like a
12  general warning.
13      Q.    The next paragraph, "The incidence of
14  neural tube defects in the fetus may be increased
15  in mothers receiving Valproate during the first
16  trimester of pregnancy.  The Centers for Disease
17  Control, CDC, has estimated the risk of valproic
18  acid exposed woman having children with spina
19  bifida to be approximately 1 to 2 percent."
20      A.    Uh-huh.
21      Q.    Now, if the manufacturer had known that
22  the incidence could be higher, would you have
23  wanted to have known that?
24            MR. KLATT:  Objection, form and
25  foundation.
```

1    A.    I would have wanted to have known that.
2    BY MR. BROSS:
3    Q.    Would you have expected them to report
4    it?
5          MR. KLATT:  Objection, again, form and
6    foundation.  You can answer, Doctor.
7          THE WITNESS:  Okay.
8    A.    Yes.
9    Q.    "Other congenital anomalies, example,
10   craniofacial defects, cardiovascular malformations
11   and anomalies involving various body systems
12   compatible and incompatible with life have been
13   reported.  Sufficient data to determine the
14   incidence of these congenital anomalies is not
15   available."
16   A.    Okay.
17   Q.    And, again, I'm just asking, would you
18   want to know the totality of the risks of a drug
19   that you are considering using?
20   A.    I would want to know what is -- what is
21   known, yes.
22   Q.    And I think we mentioned earlier or I
23   asked you earlier if you would expect for a drug
24   label to be accurate?
25   A.    Well, accurate, yes.

```
 1        A.    Yes.
 2        BY MR. BROSS:
 3        Q.    And may that have played a decision in
 4   your prescription decisions?
 5              MR. KLATT:  Objection, speculation.
 6        A.    Well, it would depend on the situation.
 7        Q.    But if the potential for increased
 8   congenital birth defects was actually four-fold
 9   higher, would that have been important for you to
10   know?
11              MR. KLATT:  Objection, form and
12   foundation.
13        A.    It would be important to know.  But,
14   again, without knowing exactly the situation at
15   the time with the patient being pregnant, having
16   seizures, tol -- not tolerating other medications,
17   I don't know exactly what our conversation -- I
18   know what our conversation would be about, but I
19   don't know what the -- what decision we would come
20   up with, but I would definitely talk to the
21   patient.
22        Q.    Is there anything here, though, that led
23   you to believe or leads you to believe that
24   Depakote is more teratogenic than other
25   antiepileptics?
```

 1          MR. KLATT: Objection, asked and answered
 2    multiple times.
 3          MR. BROSS: I think it's different.
 4     A.   I have to read that. Let me read the
 5    whole thing again. This is the 2004, okay.
 6          It certainly doesn't tell -- doesn't give
 7    percentages in comparisons of other drugs. It is
 8    a general statement that there is a risk -- a
 9    fetal risk with this drug.
10     BY MR. BROSS:
11     Q.   I think you read my mind on -- my next
12    question was, there's nothing in the label that
13    tells you the overall incident rate could be
14    higher, could be anywhere from 10 to 28 percent?
15          MR. KLATT: Objection, form, lack of
16    foundation.
17     A.   No.
18     Q.   And I think it says there's really -- the
19    last paragraph, insufficient data -- well,
20    "sufficient data to determine incidence of these
21    congenital anomalies is not available."
22          And I guess it was safe to say -- safe
23    for me to assume or say that you didn't have any
24    knowledge of these higher levels back in 2003 or
25    2004?

1  you were asked, you would not want the data and

2  information to be speculative.  And I think your

3  answer to that is correct.  But I think it's fair

4  that you would want the data that's used and

5  reported to be accurate about conditions and --

6  for medications that you're prescribing?

7       A.   Yes.

8       Q.   And of course, while it's true that

9  babies could be born with or without birth

10 defects, whether using any of the antiepileptics,

11 you would want to know -- you would want to know

12 the actual increased risks in forming decisions?

13      A.   Yes, but I -- but it's broad.  So I want

14 to know of all the various types of

15 teratogenicity, to the extent that they're known,

16 I would, yeah.

17      Q.   And you would take all that into account

18 in your prescribing practices?

19      A.   Yes.

20      Q.   And I know there was some discussion

21 about the pregnancy categories, pregnancy

22 categories C and D.  But within those categories,

23 they're not actually quantifying or telling you

24 what risks there are; is that correct?

25           MR. KLATT:  Objection to form.