# EXHIBIT 1

No. 3:14-cv-847-NJR in re: D.W.K., Jr., et al. v Abbott Laboratories, Inc.
03/12/2015 - trial day 9 - p.m. session
Case 3:17-cv-00793-NJR-MAB Document 71-10 Filed 01/08/18 Page 2 of 6 Page ID #3466

```
                                              2149
 1            UNITED STATES OF AMERICA
            SOUTHERN DISTRICT OF ILLINOIS
 2

 3  D.W.K., Jr., and parents    )
    Mary and Daniel Kaleta,     )
 4                              )
              Plaintiffs,       )
 5  v.                          ) No. 3:14-cv-847-NJR
                                )
 6  Abbott Laboratories, Inc.,  )
                                )
 7            Defendant.        )

 8

 9

10       TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                DAY 9 - P.M. SESSION
11

12     BEFORE THE HONORABLE NANCY J. ROSENSTENGEL
               UNITED STATES DISTRICT JUDGE
13

14                  March 12, 2015

15

16

17

18

19

20
    REPORTED BY:    Christine A. Dohack, RMR, CRR,
21                  Official Court Reporter
                    301 West Main Street
22                  Benton, Illinois  62812
                    (618) 439-7725
23                  Christine_Dohack@ilsd.uscourts.gov

24
    Proceedings recorded by mechanical stenography, produced
25  by computer-aided transcription.
```

```
                                              2150
 1  APPEARANCES:

 2  FOR PLAINTIFF:    John Eddie Williams, Esq.
                      John T. Boundas, Esq.
 3                    WILLIAMS KHERKHER HART BOUNDAS, LLP
                      8441 Gulf Freeway, Suite 600
 4                    Houston, TX  77017
                      (713) 230-2330
 5
                      Kenneth T. Fibich, Esq.
 6                    FIBICH HAMPTON LEEBRON
                          BRIGGS & JOSEPHSON, LLP
 7                    1150 Bissonnet
                      Houston, TX  77005
 8                    (713) 751-0025

 9                    Phillip L. Sampson, Jr., Esq.
                      BRACEWELL & GIULIANI LLP
10                    7111 Louisiana, Suite 2300
                      Houston, TX  77002
11                    (713) 221-1258

12
    FOR DEFENDANT:    Dan H. Ball, Esq.
13                    BRYAN CAVE, LLP
                      One Metropolitan Square
14                    211 N. Broadway, Suite 3600
                      St. Louis, MO  63102
15                    (314) 259-2000

16                    Paul F. Strain, Esq.
                      Michael B. MacWilliams, Esq.
17                    VENABLE LLP
                      750 East Pratt Street, Suite 900
18                    Baltimore, MD 21202
                      (410) 244-7717

19

20

21

22

23

24

25
```

```
                                              2151
 1                  I N D E X
                    WITNESSES
 2

 3  ALL WITNESSES:                          PAGE:

 4  For Plaintiff:

 5    MARY KALETA:
        Direct Examination by Mr. Fibich    2152:22
 6      Cross-Examination by Mr. Strain     2213:7
        Redirect Examination by Mr. Fibich  2269:22
 7      Recross-Examination by Mr. Strain   2280:11

 8    Cheri Spath:
        Video Designations by - Exhibit No. 2495  2285:4
 9
```

```
                                              2152
 1       (Subsequent to lunch recess, proceedings continued
 2  in open court at 12:26 p.m., jury present.)
 3       THE COURT:  All right.  Be seated.  I hope you
 4  enjoyed your lunch, ladies and gentlemen.  We'll proceed
 5  with the plaintiff's next witness.
 6       MR. FIBICH:  At this time, the plaintiff would
 7  call Mary Kaleta.
 8       THE COURT:  Mrs. Kaleta, if you will come forward
 9  to the witness stand, please.
10       (Witness sworn by clerk.)
11       THE WITNESS:  My name is Mary Kaleta.  M-A-R-Y.
12  K-A-L-E-T-A.
13       MR. FIBICH:  Okay.  May I proceed?  And I think
14  I'm a little loud.
15       THE CLERK:  I'm working on it.
16       MR. FIBICH:  Okay, thank you.  Are we ready to go?
17       THE CLERK:  We'll try.  Keep talking.
18                    MARY KALETA,
19  having been first duly sworn, was examined and testifies
20  as follows:
21                 DIRECT EXAMINATION
22  BY MR. FIBICH:
23  Q.   Would you please identify yourself again for the
24  members of the jury.
25  A.   Yes.  My name is Mary Kaleta.
```

No. 3:14-cv-847-NJR in re: D.W.K., Jr., et al. v Abbott Laboratories, Inc.
03/12/2015 - trial day 9 - p.m. session
Case 3:17-cv-00793-NJR-MAB Document 71-10 Filed 01/08/18 Page 3 of 6 Page ID #3467

```
                                                    2197
 1  A.      Yes.  I had to because of the school.
 2  Q.      Does ▮▮▮ like girls?
 3  A.      Yeah, he's 15.
 4  Q.      Has he told you that he would like to have a wife
 5  some day?
 6  A.      Oh, yes.
 7  Q.      You said, oh, yes.  Why do you say it like that?
 8  A.      Because he mentions it several times.  He
 9  mentioned, when I get married, mom, I'm going to live
10  close to you.  I'm like, okay, ▮▮▮▮  But it would take a
11  real special woman.
12  Q.      Do you think that person really exists in this
13  world that would be able to take care of ▮▮▮ with all
14  his problems?
15          MR. STRAIN:  Objection, Your Honor.
16          THE COURT:  Overruled.
17  A.      No.
18  Q.      (BY MR. FIBICH)  Does ▮▮▮ get angry?
19  A.      Yes.  Yes, he has tantrums.
20  Q.      And why does he have tantrums?
21  A.      I'll tell him, ▮▮▮▮ it's time for you to cath.
22  And he'll say, I'm not doing this when I get older.  I'm
23  going to quit it.  And he, he's physical.  He punched my
24  cabinet window and broke it.
25  Q.      And why does he, why does he object to cathing
```

```
                                                    2198
 1  himself, if you know.
 2  A.      He hates it.  He hates that he has to go and cath
 3  himself.  He says he wished he could be like ▮▮▮ and
 4  just go like ▮▮▮.
 5  Q.      You okay?
 6  A.      Yeah.
 7  Q.      Let's get through it, okay?
 8  A.      Okay.
 9  Q.      Do you think ▮▮▮ -- I mean ▮▮▮ needs
10  psychological care?
11  A.      Yeah, I do.
12  Q.      Can you afford that?
13  A.      No, I can't.
14  Q.      References have been made to the therapist that
15  has come to your house, and we're going to look at some
16  videos of that in a minute.  Is the therapist still
17  working with ▮▮▮ -- I mean, excuse me -- ▮▮▮?
18  A.      No.  Since my husband's been unemployed, we lost
19  ▮▮▮ therapist.  And he really needs therapy.
20  Q.      And ▮▮▮ is here with you and your husband during
21  this trial; is that correct?
22  A.      Yes.  I have to take care of him.
23  Q.      And have you noticed any problems with ▮▮▮
24  because he's not getting his therapy?
25  A.      Yes.  His muscles are tightening and his muscles
```

```
                                                    2199
 1  are aching and I got him a heating pad, but we can't help
 2  it.  I mean, I took him to the hotel gym just to go on the
 3  treadmill to get him walking and it helps a little, but he
 4  needs more than that.  He needs his muscles stretched out.
 5  He needs the work that William was doing with him.
 6  Q.      And when was, when did William stop doing therapy
 7  for ▮▮▮?
 8  A.      That was in November with the MACE surgery.  He
 9  hasn't had it since then.
10  Q.      Does ▮▮▮ gets depressed?
11  A.      Yes, he does.
12  Q.      And how do you notice that or how do you perceive
13  that?  Why do you say he gets depressed?
14  A.      Well, because he has a temper.  And he speaks out
15  a lot.  And he, he speaks his mind.  And, you know, he'll
16  say things like, I'm going to kill myself.  You know?
17  Q.      Have you taken those threats seriously?
18  A.      Of course.  You got to.
19  Q.      Did the school call you about ▮▮▮ threatening
20  suicide at school?
21  A.      Yeah.  He said, I'm going to shoot myself.  And
22  Mr. R. -- that's what they call him, the counselor -- he
23  called me, he says, you got a gun in the house?  I says,
24  no.  And he says, well, this is what your son just said.
25          And then I talked to Mr. R.  He says, I know that
```

```
                                                    2200
 1  he wants to kill himself but this is like with a gun, so
 2  the school had to take seriously.  They take anything
 3  seriously, really.
 4  Q.      Let me ask about another school activity.  Has he
 5  attempted to swim at the school?
 6  A.      Yeah.  That's a field trip in the summertime.
 7  They go to a public swimming pool.  They won't let ▮▮▮
 8  go in because he has a diaper.  So, he can't go on that
 9  field trip.
10  Q.      If he went on the field trip, he could put a
11  bathing suit on, could he not?
12  A.      He still has to wear the diaper.
13  Q.      Who, who spends the most time with ▮▮▮?
14  A.      I do.
15  Q.      Do you help him bathe?
16  A.      Yes, I do.
17  Q.      Why do you have to help him bathe?
18  A.      Okay.  Um, well, ▮▮▮ cannot stand -- he can
19  stand but he's very wobbly, let's put it that way, okay?
20  He has a chair in the tub.  He sits in the chair.  He
21  could wash his front, he even puts his head in there.  But
22  I help him with his head.  And -- but when it comes to his
23  backside, he can't wash his backside at all because if he
24  were to stand in the tub, he will fall and hurt himself.
25  So what he does is, I say, okay, ▮▮▮, he stands up real
```

No. 3:14-cv-847-NJR in re: D.W.K., Jr., et al. v Abbott Laboratories, Inc.
03/12/2015 — trial day 9 — p.m. session
Case 3:17-cv-00793-NJR-MAB Document 71-10 Filed 01/08/18 Page 4 of 6 Page ID #3468

2209

1 Q. Does ▇▇▇ write very well?
2 A. No, he does not.
3 Q. Does he spell very well?
4 A. No.
5 Q. Are you currently using birth control?
6 A. Yes.
7 Q. And is your intention to never get pregnant again?
8 A. Never.
9 Q. Did ▇▇▇ write a story called Miracles?
10 A. Yes, he did.
11 Q. Did he write this on his own, without any prodding
12 from you or your husband?
13 A. Yes, he did.
14 Q. Has ▇▇▇ adopted the Christian theology of the
15 New Hope Baptist Church?
16 A. Yes. He loves going to church.
17 Q. Does he go regularly to church?
18 A. Yes, he does.
19 Q. And has he been baptized in that church?
20 A. Yes, he has.
21 Q. I want to ask you if that is something that ▇▇▇
22 wrote?
23 A. Yes, it is.
24 Q. And it's hard for me to read because of his
25 handwriting. We've got it up here on the screen. Would

2210

1 you please read it?
2 A. Sure. The title is called Miracles. "God worked
3 a miracle in my life and this is the miracle. I wasn't
4 supposed to walk but God saw different and he made me
5 walk. God does work miracles. Turn to Psalms 139:7 to
6 11."
7 Can I tell how he did this?
8 Q. Please. How did he do this?
9 A. He was online. He saw a five-year-old online
10 behind a pulpit and he turned to me, he says, *mom, look at*
11 *this*. I said, *yeah*. He says, *if this five-year-old could*
12 *do it, I could do it*. He grabbed a piece of paper and
13 pencil and he titled it, like what I just read, this is
14 what he wrote because he saw you a five-year-old on the
15 internet.
16 Q. Mary, Mr. Strain is going to have a lot of
17 questions for you about things in medical records that
18 happened long time ago.
19 A. That's okay.
20 Q. Are you prepared to answer those questions?
21 A. Yes.
22 MR. FIBICH: Pass the witness, Your Honor.
23 THE COURT: Okay. We have been going for quite
24 awhile, so let's take a break. We're also having a few
25 technical difficulties we'll explore. So, let's take 15

2211

1 minutes.
2 MR. STRAIN: Thank you, Your Honor.
3 (Court recessed from 2:06 p.m. to 2:21 p.m.)
4 (Proceedings continued at the bench, outside the
5 hearing of the jury.)
6 MR. STRAIN: I didn't want to do this without
7 advising the Court. She said since her husband got
8 unemployed, they lost his insurance. His physical
9 therapist for 15 years, they have lost, and he really
10 needs it and they have no way to get it. I'm entitled to
11 ask what they have done to investigate forms of assistance
12 to get that physical therapist back. She has those --
13 case law -- and I have it right here, but there is case
14 law on it that once someone opens the door like that and
15 says because of lack of funds, they can't get a needed
16 service, they're not -- then I'm entitled to inquire into
17 what they have done to attempt to get public assistance.
18 And there is public assistance.
19 And they also said they couldn't afford
20 counseling, so there's two different things in, you know,
21 the record. She said one of them with tears. So, it's a
22 very emotional thing. It's in the context of this young
23 man needing emotional counseling because he's threatening
24 to shoot himself and couldn't be more prejudicial for the
25 jury thinking, unless they give him an award, he's going

2212

1 to be without counseling and be at risk of suicide. It's
2 very prejudicial.
3 THE COURT: So what you want to do is what she's
4 done to inquire?
5 MR. STRAIN: What she's done to inquire and I
6 don't know what she's going to say, and then we'll address
7 that with our life care plan people if things are
8 available to her. We have to now.
9 MR. FIBICH: Well, Your Honor, I don't --
10 MR. STRAIN: They're going -- then the jury's
11 going to think if they don't give them an award, the young
12 man's at risk. It's a terrible thing.
13 MR. FIBICH: Your Honor, I don't think it opened
14 the door. Basically she said her husband's unemployed.
15 They don't have their therapist. She doesn't have the
16 money to pay for it. The fact of the matter is, he's
17 going to find employment. So there's no benefits. He
18 gets into total speculation about what's out there. If he
19 wants to ask her if -- I mean, what is it you want to ask
20 her?
21 MR. STRAIN: I'm going ask her what she's done to
22 investigate different programs.
23 THE COURT: And I think that's reasonable. As
24 long as it doesn't go too far, you're entitled to that.
25 MR. STRAIN: Thank you very much, Your Honor.

No. 3:14-cv-847-NJR in re: D.W.K., Jr., et al. v Abbott Laboratories, Inc.
03/12/2015 - trial day 9 - p.m. session
Case 3:17-cv-00793-NJR-MAB   Document 71-10   Filed 01/08/18   Page 5 of 6   Page ID #3469

**2217**

1  Q.   And of course, we, as part of this, we were given
2  the Argo Community High School records.
3       That other call you got though from the school
4  about ▓▓▓▓ threatening to hurt himself at school?
5  A.   Yes.
6  Q.   If we want to see more details of that, when it
7  happened, what exactly was said, we should go to the
8  school records for that, too, shouldn't we?  I mean, if
9  they made a record about something on Facebook, they would
10 have made a school record about that.
11 A.   He wasn't at Argo.
12 Q.   Where was he?
13 A.   I'm not sure what school it was, but it was
14 grammar school and Mr. R. was his counselor.
15 Q.   So we'll go to those records then.  How long ago
16 was that?  I thought you had -- I misunderstood.  I
17 thought you said that was recent.  How long ago was that?
18 A.   I can't be for sure, so I don't know if I should
19 say.
20 Q.   Okay.  Well, I don't want you to guess, but can
21 you tell us whether it's within the last couple years or
22 when he was younger or when, before he --
23 A.   I would say somewhere around junior, 6th, 7th, 8th
24 grade, somewhere around there.
25 Q.   So, 6th, 7th, 8th grade is somewhere between three

**2218**

1  and four years ago?
2  A.   Yeah.
3  Q.   Does that sound about right?
4  A.   (Nonverbal response.)
5  Q.   Okay.  And nothing like that since?
6  A.   No.  But he's still at home.
7  Q.   Okay.  Now, you mentioned that you wanted
8  counseling for ▓▓▓▓ and you wanted to get the therapist
9  back, but your husband lost his insurance, his work and
10 the insurance with it; right?
11 A.   Yes.
12 Q.   So -- and that happened in January, I think, when
13 your husband lost his job?  The first of the --
14 A.   Yes.
15 Q.   So, have you and your husband looked into what
16 the, kind of public assistance you could get?
17 A.   We're doing it right now.
18 Q.   You're --
19 A.   We're in the process right now.
20 Q.   What public assistance are you looking into that
21 will help ▓▓▓▓?
22 A.   It was called All Kids.  I am having help through,
23 the state social work is helping me try and get insurance
24 on ▓▓▓▓
25 Q.   And how about, has she told you about the Illinois

**2219**

1  program called --
2       MR. FIBICH:  Excuse me, Your Honor.  I want to
3  object to the relevancy of this, calls for speculation,
4  violates the motion in limine, violates what Mr. Strain
5  says we were going to talk about.
6       MR. STRAIN:  It does not.
7       THE COURT:  Objection will be overruled.
8  Q.   (BY MR. STRAIN)  I'm sorry.  Let me just ask:  Has
9  she talked to you about or have you looked into Illinois
10 program called SAS, for children like ▓▓▓▓ or needs like
11 that?
12 A.   There is a program called DSCC.
13 Q.   Have you looked into that?
14 A.   I have that.
15 Q.   Okay.  Okay.  So --
16 A.   But that's only to do with the spina bifida.
17 Q.   Okay.  I don't want to get into too much detail.
18 I don't think we need to on this because there are people
19 who specialize in this.  I don't.  But you are looking
20 into getting assistance for ▓▓▓▓ as you should, as he
21 needs; right?
22 A.   Correct.
23 Q.   Okay.  Good.  Now, just so you know where I'm
24 going, Mrs. Kaleta, I am going to ask, now ask you
25 questions about a couple of things Mr. Fibich asked you

**2220**

1  about and about medical records, about what doctors told
2  you.  Okay?
3  A.   Okay.
4  Q.   All right.  And I understand, you know, now in
5  2015, how hard it is to remember.  I understand that.
6  Everyone understands that.  I'm not going to ask you about
7  what your doctors knew because we have their testimony on
8  that.  I'm just going to ask you about what they told you.
9  Okay?
10 A.   Okay.  But I don't remember 21 and 15 years ago.
11 Q.   Sure.  Absolutely.  Okay.  But let me see if we
12 can go about -- I just want you to understand, I'm not
13 going to ask you about what your doctors knew.  The
14 doctors will testify about that.  I just want to ask you
15 about what they told you.  Okay?
16 A.   (Nonverbal response.)
17 Q.   All right.  Now, Dr. Timothy McGonagle is your
18 doctor.  He's the doctor who takes care of you for
19 epilepsy; correct?
20 A.   Correct.
21 Q.   I want to put his picture up there.  You have to
22 tell me that's his picture.  I got it off his website.
23 A.   Yeah, that's him.
24 Q.   That's Dr. McGonagle.  Okay.
25 A.   Yeah.

No. 3:14-cv-847-NJR  in re: D.W.K., Jr., et al. v Abbott Laboratories, Inc.
03/12/2015 — trial day 9 — p.m. session
Case 3:17-cv-00793-NJR-MAB  Document 71-10  Filed 01/08/18  Page 6 of 6  Page ID #3470

2293
```
 1        If we need to pull in a custodian, it would have
 2 been good -- we have been talking about agreements on
 3 medical records since the beginning of this trial.  I
 4 really, I hate to say never, but I can't remember ever
 5 having a time when people squabbled about medical records
 6 in a major suit like this.  There are enough things to
 7 deal with.
 8        THE COURT:  Well, that's what I've been shocked
 9 about when it, when it comes up, so I didn't limit him on
10 what he was allowed to question her about.  So, that
11 portion will come in.  You said it's going to be a
12 redacted version; correct?
13        MR. STRAIN:  Yes, Your Honor.  Yes, Your Honor.
14        MR. BALL:  So the parts we questioned about are in
15 evidence, and that's what we read.
16        MR. SAMPSON:  I'm not sure I understand.  What we
17 talked about at the bench conference, Your Honor, was the
18 exact portion that you said he should not use with this
19 witness is exactly what they pulled back up, highlighted,
20 and in fact underlined in red.
21        THE COURT:  I don't think it was.
22        MR. SAMPSON:  It was the portion that they were
23 discussing what she told them, which you said --
24        THE COURT:  I said he could ask her about
25 conversations between her and the doctor but not what the
```

2294
```
 1 doctor was saying to another doctor.
 2        MR. SAMPSON:  And the entire document is a
 3 communication between doctors.
 4        MR. BALL:  He's recounting his conversation with
 5 the patient, Phillip.
 6        MR. SAMPSON:  I know exactly what he is saying.
 7 There are, there are aspect -- let me clarify one thing.
 8 There were a number of medical records that Mr. Strain
 9 went through.  Some of those, we aren't going to have
10 objected to.  I don't know which were which with him in
11 that list.  But the McGonagle records, because we have a
12 real problem with, with much of McGonagle's testimony and
13 the, and some of the information within his documents,
14 that that document should not come into evidence until we
15 actually argue the substance of it, which will come in
16 connection with Dr. McGonagle's testimony we're going to
17 offer.
18        MR. BALL:  The only part of Dr. McGonagle's record
19 that was shown to the jury and questioned Miss Kaleta
20 about was the part the judge ruled was appropriate, which
21 was the communications between the patient and the doctor
22 which was, is admissible under numerous rulings.  And you
23 made that ruling.  That's all we're offering at this time
24 with respect to that record.
25        I am -- we have not objected to, and you, and even
```

2295
```
 1 over objection, there's been all kinds of Abbott records
 2 going in with iffy foundation and all that kind of thing
 3 and we have gone right along here.  And now we have the
 4 medical records of the mother, and they're sitting here
 5 trying to keep them out.  That's unbelievable.
 6        MR. STRAIN:  They're putting in stacks of the
 7 child's records asking our agreement like that, without
 8 any foundation.
 9        THE COURT:  Well, I'm not going to hear any more
10 on it today.  That portion will come in.  I don't
11 understand, I mean, the medical records -- I mean, you
12 know, it blows my mind that we can't reach an agreement on
13 the admissibility of medical records.  It confirms, you
14 guys can't agree to anything and I'm getting tired of it.
15        MR. SAMPSON:  I understand, Your Honor.  And
16 again, some of those we don't have a problem with.  The
17 earlier ones that are, we believe, relevant is the
18 McGonagle records that are primarily --
19        THE COURT:  He sat here and went over the records
20 with the witness, and I said he could do that and I said
21 they come into evidence.  Is that understood?
22        MR. STRAIN:  Yes.
23        THE COURT:  Okay.  I'll see everybody tomorrow in
24 case we have anything to take up.
25        (Court adjourned at 4:41 p.m.)
```

2296
```
 1                   REPORTER'S CERTIFICATE
 2        I, Christine A. Dohack, Registered Merit Reporter
 3 and Certified Realtime Reporter in and for the United
 4 States District Court for the Southern District of
 5 Illinois, do hereby certify that I was present at and
 6 reported in machine shorthand the proceedings in the
 7 above-mentioned court; and that the foregoing transcript
 8 is a true, correct, and complete transcript of the
 9 electronic recording.
10        I further certify that I am not an attorney for,
11 nor employed by, nor related to any of the parties or
12 attorneys in this action, nor financially interested in
13 the action.
14        I further certify that this transcript contains
15 pages 2149-2296 and that this reporter takes no
16 responsibility for missing or damaged pages of this
17 transcript when same transcript is copied by any party
18 other than this reporter.
19        IN WITNESS WHEREOF, I have hereunto set my hand at
20 Benton, Illinois, this 12th day of March, 2015.
21
22                      s/Christine A. Dohack, RMR, CRR
23                      _____
24                      Christine A. Dohack, RMR, CRR
25
```