# EXHIBIT 14

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

IN RE DEPAKOTE CASES:                )
                                     )
RHEALYN ALEXANDER, et al.,           )
                                     ) No. 12-cv-52-NJR-SCW
        Plaintiffs,                  )
                                     )
v.                                   )
                                     )
ABBOTT LABORATORIES, INC.,           ) No. 12-cv-53-NJR-SCW
et al.,                              )
                                     )
        Defendants.                  )


VIDEO DEPOSITION OF MARTHEE J. SANSONE

January 18, 2017
9:59 a.m.


Reporter: Jude Arndt, CSR, RPR
CSR No. 084-004847

Golkow Technologies, Inc. - 1.877.370.DEPS

Page 66

1    Q.   Why would you have been concerned about
2    the dose of Depakote you were taking and the effect on
3    a pregnancy if Dr. Nemeth had not already discussed
4    birth defect risks with you before January 27th of
5    2004?
6    A.   Because she did discuss that with my first
7    son.
8    Q.   Ah, so she discussed that with you during
9    your pregnancy with ▮▮▮▮▮▮?
10   A.   A slight chance.
11   Q.   Did Dr. Nemeth say anything --
12   A.   And I was on a high dosage at that point
13   in time.
14   Q.   I didn't mean to interrupt you.
15   A.   That's okay.
16   Q.   Did Dr. Nemeth say anything more -- and
17   this was before your pregnancy with ▮▮▮▮▮▮?
18   A.   Yes.
19   Q.   And you became pregnant with ▮▮▮▮▮▮ in
20   approximately July of 2002?
21   A.   Correct.
22   Q.   So at some point before July of 2002 --
23   and you first went to see her in February-March of
24   2000; right?

Marthee J. Sansone

Page 87

1  A. Yes, I see that.
2  Q. Do you have any reason to doubt that you
3  called Dr. Nemeth's office in January 27th of 2004 to
4  ask that question?
5  MS. WILLIAMSON: Object to the form.
6  A. I'm assuming I did, yes.
7  Q. (By Mr. Gendron) So that you have no
8  reason to doubt the accuracy of what's there; right?
9  A. No.
10 Q. So my question is if, as reported here,
11 you asked whether you should reduce your Depakote
12 before you became pregnant, why did you ask that
13 question?
14 A. Probably because I was on a high dosage
15 again.
16 Q. How would that make a difference?
17 A. Of the dosage?
18 Q. Yes, as opposed to a low dosage. What --
19 how or why would a high dosage concern you relative to
20 a pregnancy?
21 A. Because every time I went to the ER, they
22 always told me I was on a high dosage.
23 Q. Did they ever say to you at the ER and a
24 high dosage can have negative implications for a

1  pregnancy?
2       A.   No.
3       Q.   Did Dr. Nemeth ever say that a high dosage
4  of Depakote could have a negative effect on a
5  pregnancy?
6       A.   No.
7       Q.   So again, why did you ask the question, if
8  nobody at the ER told you that a high dosage made a
9  difference and Dr. Nemeth never told you that having a
10 high dosage could make a difference?
11      A.   Well, if I recall, back when we were
12 reading earlier, she put me down on a lower dosage when
13 I was pregnant the first time.  So if I was on a higher
14 dosage, I would want to go back down to that lower
15 dosage that I was the very first time I was pregnant.
16      Q.   So you at least in your own mind had some
17 sense that the amount of Depakote you were taking could
18 have an effect on your pregnancy; is that right?
19      A.   The slight risk.
20      Q.   Whatever it was, you thought that it could
21 have an effect; right?
22      A.   A what?
23      Q.   Whatever the amount of the risk was, you
24 thought that there was a risk there?

```
 1        A.    For the higher dosage.
 2        Q.    Yes, sufficient --
 3        A.    For a high dosage.
 4        Q.    Sufficient for you to want to talk to your
 5   doctor about it?
 6        A.    Correct.
 7        Q.    And that's about six months before you
 8   conceived [redacted]; right?
 9        A.    Yes.
10        Q.    Do you recall within roughly a week or so
11   of that January 27th, 2004, call to Dr. Nemeth's office
12   meeting with Dr. Nemeth and having a lengthy discussion
13   with her about the importance of being on seizure
14   control during your pregnancy?
15        A.    It does recall somewhat, but I don't
16   remember the entire conversation.
17        Q.    Do you recall her telling you that
18   Depakote is a Class D drug?
19        A.    No.
20        Q.    Do you recall her telling you that a Class
21   D drug is a drug that has shown to have demonstrated
22   fetal risk?
23        A.    When I was pregnant with [redacted]?  Is this
24   when I was trying to get pregnant with [redacted]?
```

Page 95

1  you remember seeing this -- it was Lamictal?
2       A.   I do not recall that.
3       Q.   Do you see here where she says that she
4  gave you a conversion schedule that would take
5  approximately two months?
6       A.   I do not recall that either.
7       Q.   Do you see that that's what it says,
8  though?
9       A.   Yes.
10      Q.   Do you have any reason to believe that she
11 gave you a conversion schedule that would take
12 approximately two months?
13      A.   If that's what she wrote down.
14      Q.   Well, you remember earlier we talked about
15 converting from Depakote to another medication before
16 you became pregnant with ▇▇▇▇▇▇▇?
17      A.   Correct.
18      Q.   And that you said was in June of 2001 --
19 excuse me -- 2003 -- strike that.
20      A.   2002.
21      Q.   I'm going to get it right.  You had a
22 discussion with Dr. Nemeth in June of 2002 about
23 converting from Depakote to another medication?
24      A.   Correct.

1      A.    I guess that's what I just assumed --
2  sorry.  That's what I just always assumed, that the
3  lower the dosage, the better off, because I always
4  wanted to go lower on my dosage.
5      Q.    My question is did Dr. Nemeth say to you
6  that there was no risk at a lower dosage?
7      A.    No.
8      Q.    So you understood there was at least a
9  slight risk even at a lower dosage?
10     A.    Correct.
11     Q.    And that was before you became pregnant
12 with ▓▓▓▓▓?
13     A.    That's correct.
14     Q.    If Dr. Nemeth said that you understood
15 some indication of the risk of using Depakote during
16 pregnancy as of February of 2004, would you disagree
17 with that testimony?
18           MS. WILLIAMSON:  Object to the form.
19     A.    As of 2004?
20     Q.    (By Mr. Gendron)  February of 2004.
21     A.    Yes.
22     Q.    If she said it was her understanding,
23 based upon this lengthy discussion that she had with
24 you on February 4th of 2004, that you had some

Page 99

1  indication of the risk of using Depakote during
2  pregnancy, would you agree or disagree with her
3  testimony?
4           MS. WILLIAMSON:  Object to the form.
5      A.   I don't recall.  I don't recall the
6  conversation.
7      Q.   (By Mr. Gendron)  I'm not asking you if
8  you recall.  I'm asking you if you would agree with her
9  testimony if that is in fact her testimony.
10     A.   If that's her testimony.
11     Q.   You would agree with it?
12     A.   I don't know what she said.  I don't know.
13     Q.   I just told you.  If she said that you had
14 some indication of the risk of using Depakote during
15 pregnancy, would you agree or disagree with that
16 statement?
17     A.   I guess I would agree with her.
18     Q.   If she said that as of February 4th of
19 2004 you understood that Depakote was a Class D drug,
20 would you agree or disagree with that statement?
21          MS. WILLIAMSON:  Object to the form.  No
22 foundation that that was the doctor's testimony.
23          MR. GENDRON:  It either is or it isn't.
24     A.   I do not recall that.

1       A.      Yes.

2       Q.      And there it says animal studies have
3  demonstrated valproate-induced teratogenicity.  Do you
4  understand that teratogenicity refers to birth defects?

5       A.      No, I did not know that.

6       Q.      I'll represent to you that it does, ma'am.

7       A.      Okay.

8       Q.      Increased frequencies of malformations as
9  well as intrauterine growth retardation and death have
10 been observed in mice, rats, rabbits, and monkeys
11 following prenatal exposure to valproate.  If you had
12 known that, you would have asked for something else;
13 right?

14      A.      Yes.

15      Q.      If you had known that malformations of the
16 skeletal system are the most common structural
17 abnormalities produced in experimental animals, would
18 you have asked for another medication?

19      A.      Yes.

20      Q.      You see that it's here in the Physicians'
21 Desk Reference, though; right?

22      A.      Yes.

23      Q.      As of April of 2002, Abbott was warning
24 about these things.  Do you see that?

Marthee J. Sansone

Page 106

1     A.    Yes.  Yes.  This is horrifying.

2     Q.    You agree that if you had known all of
3  this horrifying information you would have wanted to be
4  off Depakote; right?

5     A.    Who would want to be on it?

6     Q.    So the answer to my question is a yes?

7     A.    Yes.

8     Q.    Flip to the back page, ma'am, of Exhibit
9  Four.  In the third column all the way to the right,
10  patient information leaflet, starts about three inches
11  down.  Do you see that?

12     A.    Yes.

13     Q.    And it talks about important information
14  for women who could become pregnant.  Do you see that?

15     A.    Yes.

16     Q.    Now, it talks about migraines, but if you
17  look in the first paragraph there, in the third
18  sentence, it says Depakote is also prescribed for uses
19  other than those discussed in this leaflet, and that
20  includes seizure disorders; right?

21     A.    Correct.

22     Q.    Now, go down to where there's boldfaced
23  language that starts -- do you see it, about the middle
24  of the page in the third column?

Golkow Technologies, Inc. - 1.877.370.DEPS

Marthee J. Sansone

Page 126

```
1       Q.   Now, do you smoke, ma'am?
2       A.   Yes, I do.
3       Q.   Were you smoking at the time that you were
4  pregnant with ████?
5       A.   Yes.
6       Q.   And how much were you smoking a day?
7       A.   I probably smoked about six to eight
8  cigarettes a day.
9       Q.   For ████?
10      A.   Yes.
11      Q.   How about while you were pregnant with
12 ████ -- did you smoke during that pregnancy?
13      A.   Yes.
14      Q.   What did you -- how many cigarettes did
15 you smoke during that pregnancy?
16      A.   I was down to one cigarette a day with
17 him.
18      Q.   So it's your testimony that you weren't
19 smoking between a pack to a pack-and-a-half a day while
20 you were pregnant?
21      A.   At the very beginning, yes, but at the
22 end, no.
23           MR. GENDRON:  This is Exhibit Three.
24 Would you hand that to the witness, please?
```

Page 127

1    Q.    (By Mr. Gendron)  You have Exhibit Three
2  there, ma'am?
3    A.    Yes.
4    Q.    I'll represent to you that these are
5  records that your attorneys produced to us on your
6  behalf and on behalf of your son ███████.
7    A.    Okay.
8    Q.    And Dr. Dalla Riva we identified as your
9  OB/GYN; right?
10   A.    That's correct.
11   Q.    And he sometimes sees you at Anderson
12 Hospital?
13   A.    Yes.
14   Q.    And was he your attending OB/GYN for
15 the -- your pregnancy and delivery of ███████?
16   A.    Yes.
17   Q.    And if Dr. Dalla Riva recorded that you
18 were smoking a pack of cigarettes per day on your
19 admission date for the delivery of ███████, would you
20 have any reason to disagree with that?
21   A.    I don't recall smoking that much
22 cigarettes at that time, no.  I was down to like a --
23 one cigarette.
24   Q.    Remember how we talked earlier about the

Page 128

1  numbers in the lower right-hand corner of Exhibit Two?
2      A.   Yes.
3      Q.   On Exhibit Three, there should be -- there
4  should be Sansone and then a series of numbers as well,
5  and it's the same type of numbering.
6      A.   Okay.
7      Q.   If you would look -- we can just disregard
8  the last name, because that would be a mouthful to say
9  everything.  Just look for the page that has the number
10 21 on it, please.  And you see this is an Anderson
11 Hospital history and physical for a date of admission
12 of April 5th of 2005?
13     A.   Yes.
14     Q.   Why are you smiling?
15     A.   Dr. Dalla Riva.  The pleasant 30-year-old
16 female I'm laughing at.  Sorry.
17     Q.   You're not disagreeing with him, are you?
18     A.   No, that's just him.  That's funny.
19     Q.   And do you see under social history what
20 it says?
21     A.   Yes.
22     Q.   And there you reported to Dr. Dalla Riva
23 that you were smoking a pack per day; right?
24          MS. WILLIAMSON:  Object to the form.

Golkow Technologies, Inc. - 1.877.370.DEPS

Page 129

1      A.     That's correct, at the beginning of my
2  pregnancy.
3      Q.     (By Mr. Gendron)  That's not what it says
4  there, does it?
5      A.     It doesn't say at the end of it, though,
6  either.
7      Q.     The date is April 5th; right?
8      A.     Yes.
9      Q.     And it says she smokes -- present tense;
10 right?
11     A.     Yes.
12     Q.     It doesn't say she did smoke but no longer
13 smokes, does it?
14     A.     I still smoked.
15     Q.     Yes, and it says you were smoking as of
16 April 5th, 2005, a pack per day; right?
17     A.     That's what it says under social history.
18     Q.     Right.  Do you have any reason to think
19 Dr. Dalla Riva would have recorded what you said
20 inaccurately?
21     A.     No.
22     Q.     Do you think if you said it to him, he
23 would have put it down there the way he heard it?
24     A.     I believe he put it down the way that I

C E R T I F I C A T E

    I, JUDE ARNDT, a Certified Shorthand Reporter, do hereby certify that prior to the commencement of the examination, MARTHEE J. SANSONE was sworn by me to testify the truth, the whole truth and nothing but the truth.

    I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the proceedings as taken stenographically by and before me at the time, place and on the date hereinbefore set forth.

    I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in this action.

_____
JUDE ARNDT, CSR, RPR
CSR No. 084-004847