# EXHIBIT 5

IN THE DISTRICT OF THE UNITED STATES OF AMERICA
FOR THE SOUTHERN DISTRICT OF ILLINOIS

IN RE DEPAKOTE:

**E.R.G., a minor, by CHRISTINA RAQUEL, individually as parent and next friend of E.R.G.,**

Plaintiff(s),

vs.

**ABBOTT LABORATORIES, INC.,**

Defendant(s).

Case No. **15-cv-702-NJR-SCW**
Case No. 12-cv-55-NJR-SCW

**TRIAL DAY 3**
(A.M. Session)

BE IT REMEMBERED AND CERTIFIED that heretofore on **5/24/2017**, the same being one of the regular judicial days in and for the United States District Court for the Southern District of Illinois, **Honorable Nancy J. Rosenstengel**, United States District Judge, presiding, the following proceedings were recorded by mechanical stenography; transcript produced by computer.

***REPORTED BY***: **Molly N. Clayton, RPR, FCRR**, Official Reporter for United States District Court, SDIL, 750 Missouri Ave., East St. Louis, Illinois 62201, (618)482-9226, *molly_clayton@ilsd.uscourts.gov*

APPEARANCES:

***FOR PLAINTIFFS:*** **John T. Boundas, John Eddie Williams, Margot Trevino and Sejal Brahmbhatt** of Williams Kherkher Hart Boundas LLP, 8441 Gulf Freeway, Suite 600, Houston, TX 77017;

***FOR DEFENDANT*: Dan H. Ball and Stefan Mallen** of Bryan Cave - St. Louis, 211 North Broadway, One Metropolitan Square, Suite 3600, St. Louis, MO 63102; and,

**Joel Smith and Paula Burlison** of Bowman and Brooke LLP-South Carolina, 1441 Main Street, Suite 1200, Columbia, SC 29201

## INDEX OF WITNESS EXAMINATION


| | DX | CX | R-DX | R-CX |
|---|---|---|---|---|
| *Oakley, Godfrey* ............... | *264* | *340* | *359* | |


## MISCELLANEOUS


| | PAGE |
|---|---|
| *Sidebar conference* | *273* |
| *Sidebar conference* | *329* |

*MR. BALL:* Your Honor, this is getting into the area that's covered by your court order from yesterday about labeling issues.

*THE COURT:* Well, I disagree. I don't think that's where the question was going.

**Q.** ***(BY MR. WILLIAMS:)*** You are not a labeling expert, are you?

**A.** No, sir.

**Q.** We are not going to get into labeling.

If you just tell somebody it's a 1 or 2 percent chance, in the face of this additional information that's a 2,060 percent increase does that -- does just 1 to 2 percent tell the whole story, in your opinion?

**A.** In my opinion, it doesn't. One almost always -- when one has some data that suggests that something is either associated with or causes a problem you say how big that increase is, what the statistical significance of that is, and then if you can -- and sometimes you can't do this -- you then try to relate it to what does that mean in terms of 100 women? And so you get this first information that doesn't have in it the rate in 100 women, you sort of have to guess at that. It is an educated guess, and we were willing to do that.

And so the way that came was we knew in Atlanta that spina bifida was about a 1 in 1,000 event at that time, and so if you did 20 times that, that would be 2 percent. And so that's how you make it.

So, for me, there are two reasons for having the relative risk or this increased risk of the odds ratio is that -- first of all, it's what you actually measure in case control studies. That's what everybody does. And then you have to then make a bit of a guess to temporize. And often when we would make a statement from the CDC, based on seeing that there was an increased risk, we would also try to balance that out with saying what the absolute risk is, what it would be for a hundred women.

And because often, I think, when a woman or anyone would hear a 20-fold risk, you would think it's certain that my kid is going to have this. And if you were taking a drug that was important, you might suddenly stop it or -- which would not be what we would -- we would want to minimize that. We would want people to see their doctor and be able to do things, so we would try to temporize. So putting in the 1 to 2 percent was a way to temporize and so women could get to there.

So, in my view, the relative risk is always the most threatening, the most obvious way to say how big the risk is. And the other is important to have. There are really two sides of the same coin when you have enough information to do it.

***Q.*** Does one have to know the background risk, though, to calculate this 2,060 percent?

***A.*** Say that again, please.

***Q.*** Does one have to know the background rate of spina bifida

So, for me, there are two reasons for having the relative risk or this increased risk of the odds ratio is that -- first of all, it's what you actually measure in case control studies. That's what everybody does. And then you have to then make a bit of a guess to temporize. And often when we would make a statement from the CDC, based on seeing that there was an increased risk, we would also try to balance that out with saying what the absolute risk is, what it would be for a hundred women.

And because often, I think, when a woman or anyone would hear a 20-fold risk, you would think it's certain that my kid is going to have this. And if you were taking a drug that was important, you might suddenly stop it or -- which would not be what we would -- we would want to minimize that. We would want people to see their doctor and be able to do things, so we would try to temporize. So putting in the 1 to 2 percent was a way to temporize and so women could get to there.

So, in my view, the relative risk is always the most threatening, the most obvious way to say how big the risk is. And the other is important to have. There are really two sides of the same coin when you have enough information to do it.

***Q.*** Does one have to know the background risk, though, to calculate this 2,060 percent?

***A.*** Say that again, please.

***Q.*** Does one have to know the background rate of spina bifida

in order to calculate this 2,060 percent increased risk?

**A.** So what I think I hear you saying is that if you knew from a study or if you knew and you read that the risk was 1 percent, what would you need to do to figure out how big that increase was?

And, yes, you would have to know that. And then you would have to do the math to figure it out, which is, in some ways, simply arithmetic, but it's not something that I think most -- most physicians would walk around knowing what the background premise of spina bifida is. So as a epidemiologist, we knew that. We looked it up in our studies and we calculated it, but I think it would be a pretty rare physician who would be able to take the 1 percent and say, Ah, that's a 20-fold increase. I think, you know, one in a million, but not very many.

**Q.** So the -- and the 20.6, that's the same as the 2,060 percent increase, right?

**A.** Yes.

**Q.** And as an epidemiologist and a physician, is that an important number that you think for physicians that they should know?

**A.** Yes.

**Q.** Okay. Do you know of any other cause of spina bifida, known cause, other than valproic acid?

**A.** Yes.

**Q.** What is that?