# EXHIBIT 6

GODFREY OAKLEY, JR.,MD  
LEJEUNE vs. ABBOTT LABORATORIES

February 21, 2014  
1–4

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

J.B., A MINOR, BY LINDA LEJEUNE,
INDIVIDUALLY AS LEGAL CUSTODIAN
AND NEXT FRIEND,

      Plaintiffs,

  vs.              Case No.

                    13-cv-326-SCW

ABBOTT LABORATORIES, INC.,

      Defendant.

DEPOSITION OF

GODFREY P. OAKLEY, JR., M.D.

February 21, 2014

9:50 a.m.

2000 Century Boulevard, NE
Atlanta Marriott Century Center
Atlanta, Georgia

J. David Brown, RPR, B-1401

**Page 2**

APPEARANCES OF COUNSEL

On behalf of the Plaintiffs:

    WILLIAMS KHERKHER
    SEJAL K. BRAHMBHATT, Esq.
    8441 Gulf Freeway
    Suite 600
    Houston, Texas 77017
    Phone: 713.230.2200
    sbrahmbhatt@williamskherkher.com

    WILLIAMS KHERKHER
    JOHN EDDIE WILLIAMS, JR., Esq.
    8441 Gulf Freeway
    Suite 600
    Houston, Texas 77017
    Phone: 713.230.2200

On behalf of the Defendant:

    VENABLE LLP
    PAUL F. STRAIN, Esq.
    210 West Pennsylvania Avenue
    Suite 500
    Towson, Maryland 21204
    Phone: 410.494.6200
    pfstrain@venable.com

    VENABLE LLP
    JAMAR S. MANCANO, Esq.
    750 E. Pratt Street
    Suite 900
    Baltimore, Maryland 21202
    Phone: 410.244.7400
    jsmancano@venable.com

**Page 3**

INDEX OF EXAMINATION

WITNESS: GODFREY P. OAKLEY, JR., M.D.    PAGE

Examination by Mr. Strain                5

       – – –

INDEX TO EXHIBITS

Defendant's
Exhibit      Description                       Page

1  Abbott Laboratories, Inc.'s Notice of Deposition
    of Godfrey P. Oakley, Jr., M.D.               6

2  report by Dr. Oakley                          7

3  handwritten notes thru January 31, 2014      7

4  PDR 1994 Depakote                         193

5  Memorandum of Telephone Conversation dated
    10/29/82                                  18

6  Ciba Foundation Symposium 181, Neural Tube
    Defects                                  195

7  Teratogen Update: Valproic Acid            164

8  Abbott Interoffice Correspondence dated 11/10/82  22

9  MMWR dated August 26, 1983               49

10 article by Rosa entitled Spina Bifida in Infants of
    Women Treated with Carbamazepine During Pregnancy  52

11 MMWR dated October 29, 1982              63

12 Letter to the Editor entitled Valproic Acid and
    Spina Bifida from The Lancet, November 13, 1982  80

13 publication entitled Valium: An Oral Cleft
    Teratogen?                             100

**Page 4**

14 NEJM article entitled Cognitive Function at 3 Years
    of Age after Fetal Exposure to Antiepileptic Drugs
    dated April 16, 2009                      145

15 letter dated 7/27/83 from E.B. Chappell, Ph.D. to
    FDA Bureau of Drugs with attachments       162

16 Special Article, A North American Registry for
    Epilepsy and Pregnancy, a Unique Public/Private
    Partnership of Health Surveillance from Epilepsia 172

17 Teratogenic Effects of Antiepileptic Drugs:
    Implications for the Management of Epilepsy in
    Women of Childbearing Age from Epilepsia     178

18 FDA Talk Paper dated 11/5/82              186

19 letter dated 1/14/83 from E.B. Chappell, Ph.D. to
    FDA Bureau of Drugs with attachment        193

20 Methodology for Birth Defects Monitoring    214



Case 3:17-cv-00793-NJR-MAB   Document 74-6   Filed 01/08/18   Page 3 of 19   Page ID #3849

GODFREY OAKLEY, JR., MD                                     February 21, 2014
LEJEUNE vs. ABBOTT LABORATORIES                                        17–20

Page 17

1  A.  I wrote an expert witness report.
2  Q.  For whom?
3  A.  For the plaintiffs.
4  Q.  And roughly when was that, sir?
5  A.  It was 2009, 2010, in that neck of the
6  woods. Exact dates I don't recall.
7  Q.  And you provided that report to the
8  plaintiffs?
9  A.  Yes.
10 Q.  Did you bring that here --
11 A.  I did not.
12 Q.  -- Dr. Oakley?
13     Do you still have a copy?
14 A.  Sure.
15     MR. STRAIN: Counsel, I'll call for the
16 production of that report, please.
17 Q.  (By Mr. Strain) Dr. Oakley, when you met
18 with the lawyers for the plaintiffs, whether the
19 counsel present here or other counsel, were you
20 given any documents by those counsel?
21 A.  I don't think I've gotten -- I think the
22 answer is no.
23 Q.  Were you shown any documents by those
24 counsel?
25 A.  Maybe one or two.

Page 18

1  Q.  And what were the one or two that those
2  counsel showed you?
3  A.  I mean I asked about a report from a
4  meeting that occurred in Atlanta because I was
5  interested in what the report from that meeting had
6  been from Professor MacMahon. I believe I saw part
7  of that report there. Then I'm trying to remember,
8  I don't remember other things that I would have seen
9  at that meeting.
10 Q.  Well, Exhibit 5 to your deposition is an
11 internal FDA document. I take it the lawyers for
12 the plaintiffs showed you that?
13 A.  I may have seen this briefly, yes.
14 Q.  The lawyers showed it to you?
15 A.  Yes.
16 Q.  And when was that that the lawyers showed
17 it to you?
18 A.  I think on one of the trips to Houston,
19 probably the first one.
20 Q.  And what did you just refer to a moment
21 ago? You referred to, whatever the exact words were
22 you used, you referred to a memorandum of a meeting
23 where Professor MacMahon was present.
24 A.  I think there was a meeting around this
25 time that happened in Atlanta and I think I saw part

Page 19

1  of the report that must have been MacMahon's report
2  back to Abbott. Abbott had hired MacMahon.
3  Q.  Dr. MacMahon of Harvard --
4  A.  Exactly.
5  Q.  -- you're talking about?
6  A.  Exactly.
7  Q.  His report back to Abbott --
8  A.  Yes.
9  Q.  -- of that meeting?
10 A.  Yes.
11 Q.  And do you remember that meeting apart
12 from the documents that you were shown?
13 A.  I remember it clearly, yes.
14 Q.  Now, Dr. MacMahon raised questions --
15 first of all, did you know Dr. MacMahon before the
16 meeting?
17 A.  Personally I didn't know him.
18 Q.  Did you know of him?
19 A.  I did.
20 Q.  Did you know of his reputation?
21 A.  I have his textbook on my shelf.
22 Q.  What's that textbook?
23 A.  Textbook of Epidemiology, Principles and
24 Practices of Epidemiology.
25 Q.  He's a prominent authority in the field of

Page 20

1  epidemiology in the United States and was in early
2  1980s, correct?
3  A.  That's correct.
4  Q.  One of the most prominent in the early
5  1980s, correct?
6  A.  That's correct.
7  Q.  One of the most prominent and respected
8  authorities in the field of epidemiology, correct?
9  A.  Yes.
10 Q.  Now, you say you remember the meeting
11 clearly. Do you remember Dr. MacMahon expressing
12 skepticism or concerns about the quality of the data
13 that came out of France and the need to check to see
14 whether it was reliable?
15 A.  I do not remember that.
16 Q.  Did you see that in his report?
17     MR. WILLIAMS: You cut him off.
18 Q.  (By Mr. Strain) Had you finished your
19 answer, sir?
20 A.  No. What I remember most distinctly about
21 that was I presented evidence to him and in the end
22 I said this is, like all studies, not -- there are
23 no perfect studies but the findings here are so
24 strong, I find this convincing and I understood that
25 he agreed with me.

Case 3:17-cv-00793-NJR-MAB   Document 74-6   Filed 01/08/18   Page 4 of 19   Page ID #3850

GODFREY OAKLEY, JR.,MD                                          February 21, 2014
LEJEUNE vs. ABBOTT LABORATORIES                                           25–28

Page 25

1  ways in which bias in ascertainment of malformation
2  or in recording of exposure can lead to a distorted
3  set of data?
4      A.  Yes.
5      Q.  Do you remember that Dr. MacMahon
6  expressed to you that he needed to explore or
7  thought it was appropriate and reasonable to explore
8  whether bias in ascertainment about malformation or
9  recording of exposure had led to a distorted set of
10 data?
11     A.  I don't remember that he said that, no,
12 sir.
13     Q.  Do you believe he did not?
14     A.  To me?
15     Q.  Yes.
16     A.  I don't recall that he said that, no.
17     Q.  Do you remember enough about that meeting
18 to say that he did not say it to you or are you
19 simply saying you don't recall whether or not he
20 said it?
21     A.  I just simply don't recall.
22     Q.  Now, you would agree it would have been
23 reasonable for Dr. MacMahon to go to Lyon to
24 interview the researchers to obtain more information
25 so that he could make a judgment about whether those

Page 26

1  biases had distorted the set of data?
2          MR. WILLIAMS:  Objection.  This is way
3      outside of his designated area of expertise and
4      so we object.
5      Q.  (By Mr. Strain) Please answer, Doctor.
6      A.  Restate the question, please.
7      Q.  Do you agree that it would have been
8  reasonable of Dr. MacMahon to go to Lyon to
9  interview the researchers to determine whether those
10 biases had led to a distorted set of data?
11         MR. WILLIAMS:  Same objection.
12     Q.  (By Mr. Strain) That was reasonable for
13 him to have wanted to do that, correct?
14     A.  Yes.
15     Q.  Now, having read this document, which is
16 Exhibit 8, can you tell me whether it is consistent
17 or inconsistent with your memory of your meeting
18 with Dr. MacMahon and the Abbott representatives at
19 CDC?
20         MS. BRAHMBHATT:  I'm actually going to
21     object to the form and the completion of this
22     document.  You're asking Dr. Oakley to testify
23     to a five-page document and we only have three
24     pages in front of us.
25     Q.  (By Mr. Strain) Please answer, Doctor.

Page 27

1      A.  So say the question again, please.
2      Q.  Can you tell me whether this Exhibit 8
3  having read it is consistent or inconsistent with
4  your memory of your meeting with Dr. MacMahon at CDC
5  at the end of October of '82?
6          MS. BRAHMBHATT:  Same objection.
7      A.  What I read here is that he more or less
8  agreed with what we concluded at that meeting.
9  That's what I see here.  He said he agreed basically
10 that the relative risk was about what we said it was
11 and so I thought that it is confirming of his -- my
12 interpretation of his comments at that meeting.
13     Q.  When you learned of the data from Lyon you
14 had gone to interview the researchers, correct?
15     A.  I did.
16     Q.  You thought that was necessary in order to
17 determine the reliability of the data, correct?
18     A.  I did not feel like I needed to do that to
19 justify the reliability of the data.  I had no
20 reason to suggest -- to think that the birth defects
21 registry that I had worked with for these people for
22 a number of years was anything but standard okay
23 registry.
24     Q.  Why did you then go to interview them
25 about the data?

Page 28

1      A.  I went just to see the registry and to
2  meet with Dr. Robert.
3      Q.  Why my question was?
4      A.  Well, to look at some of the records and
5  they seemed to be -- the ones I looked at seemed to
6  be straight up.
7      Q.  Why did you want to look at some of the
8  records to see if they were straight up?
9      A.  I think I was close, we were going to a
10 second meeting, I was not far away, it was something
11 I could do.
12     Q.  But why did you want to?  That was my
13 question.
14         MS. BRAHMBHATT:  I think that's asked and
15     answered.
16         MR. STRAIN:  Asked but not answered.
17     Q.  (By Mr. Strain) Please answer, Doctor.
18         MS. BRAHMBHATT:  To the best of your
19     abilities, Dr. Oakley.
20     A.  I mean the primary reason for going was to
21 look at and see some sense of what the registry was
22 like.
23     Q.  And why did you want to do that?
24     A.  As I said, I was close, I know Professor
25 Elisabeth Robert, I had never seen her registry, I



Case 3:17-cv-00793-NJR-MAB   Document 74-6   Filed 01/08/18   Page 5 of 19   Page ID #3851

GODFREY OAKLEY, JR.,MD                                      February 21, 2014
LEJEUNE vs. ABBOTT LABORATORIES                                        29–32

Page 29

1  wanted to see that. It was a very exciting time of
2  excitement about this new cause of birth defects and
3  I wanted to see them.
4      Q.  You said you looked at records to
5  determine whether they were straight up. What did
6  you mean by that?
7      A.  I mean I looked -- the main thing that I
8  think I wanted to know is how they collected the
9  data and did they have a question and he did have a
10 question and that was what I looked at was the
11 generalities of these -- how the registry ran and to
12 understand it better.
13     Q.  What did you mean when you said you saw
14 that the records were straight up? What did you
15 mean by that?
16     A.  Well, it is a birth defects registry. So
17 how are the data collected, what was the question on
18 the questionnaire, was there a question about
19 anticonvulsants on the questionnaire. Yes, there
20 was a question about anticonvulsants on the
21 questionnaire just as Elisabeth had said that there
22 was. So that's what I mean. That seemed to me to
23 be quite ordinary and reasonable registry activity
24 and form.
25     Q.  Did you do any research concerning

Page 30

1  valproate and birth defects in connection with this
2  litigation after you were contacted by the lawyers
3  for plaintiffs?
4      A.  Did I do any research --
5      Q.  Yes, sir.
6      A.  -- after then?
7      Q.  Yes, sir.
8      A.  I was in the midst of doing some research
9  on this and trying to determine what was the current
10 pattern of use among women at reproductive age, yes.
11 But I was working on that before I was contacted.
12     Q.  You say at page 3 of your report that
13 you're being compensated at $500 an hour for
14 research, meetings, telephone conferences,
15 et cetera.
16     A.  Yep.
17     Q.  What I'm asking is what research did you
18 do that you were compensated for?
19     A.  Mostly literature research. I mean just
20 making sure that I have the papers to look at.
21     Q.  And where did you obtain the papers that
22 you --
23     A.  I had retained them many different places,
24 searching NIH -- I mean National Institute of
25 Medicine searches from the library there. You know,

Page 31

1  I have searched the way you do a standard literature
2  search, many different ways.
3      Q.  So after you were contacted by the
4  lawyers, you did do a literature search?
5      A.  Yes.
6      Q.  Do I understand you correctly?
7      A.  Yeah. Sure.
8      Q.  And what did you search for?
9      A.  I searched for valproic acid in birth
10 defects.
11     Q.  And you did that on PubMed or something
12 else?
13     A.  Yeah. PubMed, yes.
14     Q.  And did you download and copy articles?
15     A.  I mean I had some of them, so I don't
16 remember how many -- the new stuff I may have
17 downloaded, yes.
18     Q.  Were any articles from the medical
19 literature supplied to you by the lawyers for
20 plaintiffs?
21     A.  I had mine.
22     Q.  That's not my question.
23     A.  No.
24     Q.  Were any documents, articles from the
25 medical literature supplied to you by the lawyers?

Page 32

1      A.  Not that I didn't already have.
2      Q.  What articles from the medical
3  literature --
4      A.  I think --
5      Q.  -- were supplied to you --
6      A.  -- we got yesterday --
7      Q.  -- by the lawyers?
8      A.  -- the Sever -- Lammer Sever article. I
9  think it is listed as an exhibit here.
10     Q.  Any others that the lawyers gave you?
11     A.  You know, I don't recollect any others.
12     Q.  Now, did you in connection with this
13 litigation since you first started talking to the
14 lawyers, which was early in 2012, did you talk to
15 anyone, any other doctors, healthcare professionals
16 about valproate and birth defects?
17     A.  Students I talk to about birth defects and
18 valproic acid all the time.
19     Q.  Anyone else?
20     A.  I was an expert witness or I wrote a
21 letter for another case so I did that, yeah, but I
22 didn't have a deposition.
23     Q.  You wrote a letter for another case about
24 valproate?
25     A.  Yes, exactly.



Case 3:17-cv-00793-NJR-MAB   Document 74-6   Filed 01/08/18   Page 6 of 19   Page ID #3852

GODFREY OAKLEY, JR., MD                                    February 21, 2014
LEJEUNE vs. ABBOTT LABORATORIES                                       33–36

Page 33

1   Q. And that's the European case you talked
2   about?
3   A. No. A different one.
4   Q. What case was that?
5   A. A case in Pennsylvania.
6   Q. What was the name of that case?
7   A. I'm trying to remember. And I'm sorry but
8   right now I can't remember but maybe later in the
9   day I will remember.
10  Q. You wrote that letter to whom?
11  A. To the attorney.
12  Q. Who was that?
13  A. Giordana.
14  Q. Pardon me?
15  A. Patricia Giordana.
16  Q. And was that letter you wrote about
17  valproate.
18  A. It was.
19  Q. And what did you understand the purpose of
20  that letter was?
21  A. The purpose of that letter was to state my
22  opinion about whether valproic acid caused
23  spina bifida and the second letter -- there were two
24  letters. The second letter was on what are the
25  long-term educational needs for people with

Page 34

1   spina bifida.
2   Q. And did you meet with Ms. Giordana as
3   well?
4   A. I don't think we did actually.
5   Q. Have you billed the counsel -- Mr. Fibich,
6   Mr. Williams, any other counsel -- for any of the
7   time reflected on Exhibit 3?
8   A. I haven't billed anybody yet.
9   Q. When you do bill and receive the money,
10  will that money go to you, to Emory, or to some
11  other place?
12  A. It will come to me.
13  Q. The report you did in this case as your
14  own personal report, it does not purport to be the
15  work or the opinions of the CDC; is that correct?
16  A. That's correct.
17  Q. It is your own personal opinions of
18  Dr. Oakley and that's all, correct?
19  A. Yes.
20  Q. You're not speaking for the CDC in this
21  testimony or this case, you are just speaking for
22  yourself; is that correct?
23  A. That's correct.
24  Q. You left the CDC in 1998 I believe; is
25  that correct?

Page 35

1   A. Yep.
2   Q. Did you retain any documents, internal CDC
3   documents when you left?
4   A. I mean there were copies. I had copies of
5   things, yes.
6   Q. What things?
7   A. I actually don't remember. They're packed
8   in boxes and I haven't unpacked them. So I have no
9   idea. I just can't answer the question.
10  Q. So just generically what were those
11  things?
12  A. Well, I had my files, my personal files
13  there, you know.
14  Q. I guess I'm a little surprised. As a CDC
15  employee are you permitted to take with you internal
16  documents from the CDC when you leave?
17  A. Well, copies, yes. There's not any
18  problem with that. You have to leave the originals
19  but the copies, yes.
20  Q. So you brought copies of internal CDC
21  memoranda; is that correct?
22      MS. BRAHMBHATT: Objection, form.
23  A. As I say, I haven't looked at them in a
24  very long time. I can't tell you what was in those.
25  Q. (By Mr. Strain) But when you left CDC in

Page 36

1   1998, you packed documents into boxes; is that
2   right?
3   A. (Nods head affirmatively.)
4   Q. Yes?
5   A. Yes.
6   Q. Roughly how many boxes?
7   A. Oh, I don't know. I'd say 25.
8   Q. 25 boxes. Where are those 25 boxes?
9   A. They're at my house.
10  Q. Is it your testimony you haven't opened
11  any of the 25 in the last 15 or 16 years?
12  A. I actually have not.
13  Q. Are you relying for your opinions in this
14  case on any CDC documents other than what may have
15  been published in the medical literature?
16  A. No. Only the MMWR article that's in the
17  package here.
18  Q. Are you relying on any Abbott internal
19  documents for your testimony in this case?
20  A. No, sir.
21  Q. You have never been retained by Abbott for
22  any reason; is that correct?
23  A. I believe that to be true.
24  Q. You have never consulted for Abbott or
25  spoken for Abbott?



Case 3:17-cv-00793-NJR-MAB   Document 74-6   Filed 01/08/18   Page 7 of 19   Page ID #3853

GODFREY OAKLEY, JR.,MD                                February 21, 2014
LEJEUNE vs. ABBOTT LABORATORIES                                    57--60

Page 57

1   Q.  During all of the eighties and all of the
2  nineties up until 1998 you were in a position of
3  responsibility at the Center for Disease Control for
4  birth defects, weren't you?
5   A.  That's correct.
6   Q.  Were you the highest official at the
7  Center for Disease Control involved with birth
8  defects?
9   A.  I was.
10  Q.  If anyone was going to put in writing a
11 recommendation that any new AED should have a
12 registry, it should have been you, correct, anyone
13 from CDC, right?
14  A.  Yes.
15  Q.  Did you tell anyone who worked for you to
16 publish or put in writing that any new AED should
17 have a registry?
18  A.  I don't recall having done that.
19  Q.  Doctor, we've already agreed that the CDC
20 publishes the MMWR every week, correct?
21  A.  That's correct.
22  Q.  It puts out information to the medical
23 community on a weekly basis, correct?
24  A.  Yes.
25  Q.  And that MMWR was available to you to make

Page 58

1  any recommendation you believed should be made about
2  registries, correct?
3   A.  It would be a very unusual MMWR to put
4  something about establishing a registry in the --
5  for the FDA.  That's the FDA's business.
6   Q.  What is the FDA's business?
7   A.  Our business was to try to find the causes
8  of birth defects wherever they came from.  That's
9  why we ran the birth defects prevention registry and
10 why we did studies to find -- to look for causes.
11  Q.  Doctor, if you believed that a company
12 putting out a new AED should have a registry, the
13 MMWR was available to you to put that recommendation
14 in writing, correct?
15  A.  I have no recollection of anybody at CDC
16 ever having used the MMWR for such a recommendation.
17  Q.  That wasn't my question.  My question was
18 it was available to you if you wished to use it to
19 make such a recommendation?
20  A.  I don't believe --
21     MS. BRAHMBHATT:  Object to form --
22  A.  I don't believe --
23     MS. BRAHMBHATT:  -- asked and answered.
24  Q.  (By Mr. Strain) Go ahead, Doctor.
25  A.  I don't believe that even if I had written

Page 59

1  such a thing that it would have been accepted by the
2  editor of the MMWR.  It's just not -- it wasn't
3  some -- the MMWR is there to alert clinicians and
4  public health to existing and new problems.  That's
5  its primary raison d'être.
6   Q.  Doctor, in Exhibit 9 in the MMWR it talks
7  about a registry in the last paragraph, correct?
8   A.  It does.
9   Q.  Did you or anyone working for you at CDC
10 write anything else about an AED registry other than
11 that and one other MMWR from October of '82?
12  A.  Not that I am aware of.
13  Q.  Do you dispute, Doctor, that carbamazepine
14 causes spina bifida?
15     MS. BRAHMBHATT:  Objection, form.
16  A.  I didn't come prepared to discuss that.
17  Q.  (By Mr. Strain) Do you believe that
18 carbamazepine causes spina bifida?
19     MS. BRAHMBHATT:  Objection, form.
20  A.  I would have to look at the data again.
21 Clearly the newer data suggests that valproic acid
22 is far and away the cause of spina bifida for the
23 AEDs.
24  Q.  (By Mr. Strain) Well, I'm just asking
25 about your time at the CDC, Doctor, in charge of

Page 60

1  birth defects for the United States Center for
2  Disease Control, did you focus on carbamazepine as a
3  cause of spina bifida at least after the FDA's study
4  reported in Exhibit 10?
5   A.  I will tell you that during this time our
6  primary focus was on trying to determine whether
7  folic acid or another vitamin prevents spina bifida
8  or not.  And shortly after this time we learned that
9  it did and I was working overtime on trying to get
10 folic acid into women so we could prevent this birth
11 defect.
12  Q.  After the FDA study you did not focus on
13 finding that carbamazepine caused spina bifida, does
14 that mean you did not focus on carbamazepine as a
15 cause of spina bifida?
16  A.  I would say that while I was at the CDC
17 during these years I was focused primarily on
18 dealing with this huge, huge new possible important
19 public health event that a vitamin would prevent
20 most of spina bifida.  And so there were potentially
21 many other associations with this drug or that drug
22 or this environmental agent that if it didn't,
23 somebody bring it to me in a way in which it seemed
24 to be more important, I wouldn't have paid much
25 attention to it.

Case 3:17-cv-00793-NJR-MAB   Document 74-6   Filed 01/08/18   Page 8 of 19   Page ID #3854

GODFREY OAKLEY, JR.,MD                                    February 21, 2014
LEJEUNE vs. ABBOTT LABORATORIES                                        61–64

Page 61

1   Q. You said you believed that the
2  manufacturer of any new AED should have a birth
3  defect registry. How many do, Doctor?
4   A. My last recollection is that there are
5  about four that have done that.
6   Q. What are those four?
7   A. I don't recall their names right now.
8   Q. So your testimony is there are four
9  antiepileptic drugs with birth defect registries?
10   A. Pregnancy registries, yeah. New ones,
11  yeah.
12   Q. And you don't remember what any of them
13  are?
14   A. I didn't come prepared to answer that
15  question. I remember I have read some of the papers
16  and I know that they did exist -- do exist.
17   Q. How many existed before 1995 or let's say
18  before 1997?
19   A. Tell me what the question is again,
20  please.
21   Q. How many manufacturer pregnancy registries
22  for AEDs existed before 1997?
23   A. I don't know of any.
24   Q. Doctor, is carbamazepine a teratogen?
25      MS. BRAHMBHATT: Objection, form.

Page 62

1   A. I am not prepared to answer that right
2  now.
3   Q. (By Mr. Strain) You don't know?
4      MS. BRAHMBHATT: Objection, form.
5   A. As I said, before I would give an answer I
6  would like to review the data and have a chance to
7  think about it more than I've had a chance to do at
8  this point.
9   Q. (By Mr. Strain) Were all the AEDs in the
10  1990s teratogens, Doctor?
11   A. That's a tough question to answer.
12  Certainly there was concern about many of the
13  different anticonvulsants some of which are not used
14  as much anymore and the question becomes what is the
15  safest one of these and what are the size of the
16  risk and so on.
17   Q. Well, my question was were all the
18  antiepileptic drugs available for use in the 1990s
19  human teratogens; do you know?
20      MS. BRAHMBHATT: Objection, form.
21   A. It is always tough to answer a question
22  that says all.
23   Q. (By Mr. Strain) Well, I'll give you five.
24  Carbamazepine?
25   A. There was suspicion about carbamazepine,

Page 63

1  yes.
2   Q. Being a human teratogen?
3   A. Yeah.
4   Q. Phenobarbital?
5   A. Let's so but some concern.
6   Q. Phenytoin?
7   A. Yes.
8   Q. Human teratogen?
9   A. Certainly concerned about that, yes.
10   Q. Primidone?
11   A. Yes.
12   Q. Human teratogen?
13   A. Yes.
14   Q. Did you contact the manufacturer of any of
15  those four just listed -- carbamazepine,
16  phenobarbital, phenytoin, or primidone -- and ask,
17  request, or advise them to start a pregnancy
18  registry?
19   A. No.
20   Q. Doctor, let's look at the other MMWR that
21  we just made reference to. We have marked, just to
22  orient you, Doctor, the August of '83 MMWR as
23  Exhibit 9. We'll mark as Exhibit 11 the October of
24  '82 MMWR.
25      (Defendant's Exhibit 11 was marked

Page 64

1  for identification.)
2   Q. (By Mr. Strain) Did you write this,
3  Doctor, the editorial note?
4   A. I certainly would have been involved in
5  writing it and reviewing it, yes.
6   Q. It says: A registry of women currently
7  taking valproic acid during pregnancy is being
8  established.
9   A. Yes.
10   Q. I think that's something you made
11  reference to before, Doctor. Tell me what that
12  referred to, the registry that was being currently
13  established by CDC.
14   A. It basically was we had hoped to set up a
15  registry if people reported to us. And you see
16  there's a request here for physicians to send this
17  exposed women -- women who had been exposed in
18  pregnancy.
19   Q. And that phone number the physicians were
20  to call was a CDC phone number, correct?
21   A. That's correct.
22   Q. Whose phone number was that?
23   A. I think it was probably in my office but I
24  don't know for sure.
25   Q. And back at Exhibit 9, do you have that

Case 3:17-cv-00793-NJR-MAB   Document 74-6   Filed 01/08/18   Page 9 of 19   Page ID #3855

GODFREY OAKLEY, JR.,MD  
LEJEUNE vs. ABBOTT LABORATORIES

February 21, 2014  
65–68

Page 65

1  one still, Doctor?
2  A. Yes.
3  Q. If you would turn to the last paragraph of
4  that it says: CDC is assembling a registry of women
5  taking valproic acid during pregnancy. And it asks
6  physicians to call another area code 404 number,
7  correct?
8  A. Yep.
9  Q. Whose phone number was that?
10  A. I would assume it is in our branch. I
11  don't know exactly what the number is.
12  Q. Well, both MMWRs asks physicians to write
13  to the Birth Defects Branch of the CDC, correct?
14  A. Correct.
15  Q. You were the chief of that branch in
16  1982 --
17  A. That's true.
18  Q. -- and 1983, correct?
19  A. Yes.
20  Q. What did you do with the data and the
21  information when physicians called in?
22  A. We got so few of those, we didn't do
23  anything.
24  Q. How many did you get?
25  A. I actually don't recall. I would guess

Page 66

1  less than ten. I don't remember.
2  Q. Well, in October of '82 you said a
3  registry is being established and in August of
4  '83 you said CDC is assembling.
5  A. We were still trying but it didn't go very
6  far.
7  Q. What were you doing to try to assemble
8  this registry --
9  A. I think --
10  Q. -- other than giving out a phone number?
11  A. I think --
12      MS. BRAHMBHATT: Objection, form.
13  A. -- that's it.
14  Q. (By Mr. Strain) Did you reach out to any
15  physician organizations, professional organizations
16  of neurologists or obstetricians?
17  A. I don't believe we did that.
18  Q. Or pediatricians?
19  A. I don't think so.
20  Q. You were a member of a professional
21  organization of pediatricians in 1982 and 1983,
22  weren't you?
23  A. I was.
24  Q. What professional association was that?
25  A. American Academy of Pediatrics.

Page 67

1  Q. Were you a fellow of the American College
2  of Pediatrics?
3  A. It's the American Academy but yes.
4  Q. Did you reach out to your own organization
5  of which you were a fellow and encourage them to
6  have pediatricians call the CDC to report
7  pregnancies of women taking valproic acid?
8  A. We did not.
9  Q. And you believe you got less than ten
10  physicians that actually called in information?
11  A. That's true.
12  Q. And what did you do with the information
13  that was called in?
14  A. I actually don't recall. I mean, you
15  know, our thoughts were that this has been shown to
16  be a human teratogen and so I was busy and our group
17  was working primarily on other things. If it
18  worked, it worked. But if it didn't work, it didn't
19  work.
20  Q. Well, what was the purpose in CDC wanting
21  to establish a registry?
22  A. In order to learn what might be other
23  problems related to this exposure.
24  Q. Problems other than spina bifida?
25  A. Yes.

Page 68

1  Q. You believed that spina bifida there was
2  already enough information that was published and
3  put in the warning label, that was taken care of?
4      MS. BRAHMBHATT: Objection, form.
5  Q. (By Mr. Strain) Is that correct?
6  A. I believe that valproic acid since 1982
7  was a cause of human birth defects.
8  Q. Well, not my question. Did you believe in
9  1982 on the subject of spina bifida that it was
10  established that valproic acid was a cause of
11  spina bifida in the range of 1 to 2 percent and that
12  information had been published, it was in the
13  warning label, and the registry was focused on --
14  the CDC registry you wanted to establish was focused
15  on other birth defects?
16      MS. BRAHMBHATT: Objection, form.
17  A. Yes.
18  Q. (By Mr. Strain) Now, did you ask Abbott to
19  establish a registry?
20  A. I did not.
21  Q. Did anyone to your knowledge?
22  A. I don't know.
23  Q. Did anyone at CDC to your knowledge?
24  A. I don't think so.
25  Q. Did anyone at FDA to your knowledge?



GODFREY OAKLEY, JR., MD  
LEJEUNE vs. ABBOTT LABORATORIES  

February 21, 2014  
69–72

Page 69

1  A. I wouldn't know about FDA's business.
2  Q. You say in your report that: The effort
3  to establish the registry was not pursued for lack
4  of resources. Do you remember that phrase?
5  A. I do.
6  Q. When did you decide to abandon that -- was
7  it your decision to abandon the effort to establish
8  a valproate registry?
9  A. I think it just faded away. People didn't
10  come in. We didn't have money to do it. We didn't
11  have money to go out and contact organizations and
12  try to round up exposures.
13  Q. I got to ask you about that, Doctor. How
14  much money would it take to send a letter to a
15  professional organization?
16  A. You have to have somebody dedicated to do
17  this. So it would take more than we felt like we
18  could spend on the issue.
19  Q. You had a doctor who was working in this
20  field, didn't you, named Dr. Cragen?
21  A. Yes, we had -- yep.
22  Q. And how many doctors worked under you in
23  the Birth Defects Branch in the early eighties or
24  late eighties?
25  A. Probably 20.

Page 70

1  Q. 20. Did you ever think to ask any one of
2  those doctors to contact professional organizations
3  of neurologists or obstetricians or pediatricians to
4  encourage their member doctors to report pregnancies
5  to the CDC valproic acid pregnancy registry?
6     MS. BRAHMBHATT: Form.
7  A. Our primary job was to run birth defects
8  registries, not to run exposure registries. So
9  that's where our people were spent.
10  Q. (By Mr. Strain) Did you ever do what I
11  just asked you about?
12  A. And that is?
13  Q. Direct a doctor to contact professional
14  organizations of neurologists, obstetricians, or
15  pediatricians to report to the CDC valproic acid
16  registry?
17  A. No.
18     MS. BRAHMBHATT: We've been going for over
19     an hour. Can we take a quick break?
20     MR. STRAIN: Sure. Let me pursue
21     something for just a couple more minutes.
22     MS. BRAHMBHATT: Okay.
23  Q. (By Mr. Strain) You would categorize what
24  you were trying to start as an exposure registry I
25  take it; is that right?

Page 71

1  A. Yes.
2  Q. And what you said you were doing or
3  focusing on was birth defects registries --
4  A. Yes.
5  Q. -- is that correct?
6  A. Yes.
7  Q. Does that mean the Atlanta registry?
8  A. Yes, the Atlanta registry for sure.
9  Q. And what others?
10  A. Well, the CDC -- it depends upon what year
11  you're talking about. But we encouraged the
12  establishment of birth defects registries by state
13  health departments and over the years a number of
14  state health departments established those kinds of
15  registries.
16  Q. And what about the 1,200 hospital
17  registry?
18  A. That was one of our registries also, yes,
19  during that time.
20  Q. The time we're talking about the 1980s?
21  A. Yeah. It was coming and going but I think
22  it was still active in the eighties. It began to
23  wind down late eighties, early nineties.
24  Q. Why did it wind down?
25  A. The PC.

Page 72

1  Q. What's that mean?
2  A. What it means is that we bought those data
3  from a company that processed hospital records and
4  when cheaper computers came around hospitals didn't
5  send their records off to a place in Michigan to
6  have them processed. I'm assuming we're talking
7  about the same thing.
8     MR. STRAIN: We'll clarify that. But your
9     counsel has suggested a break now and that's
10     fine.
11     (A recess was had.)
12  Q. (By Mr. Strain) Back on the record,
13  Doctor. Doctor, the two letters you did for
14  Ms. Patricia Giordana that you referred to earlier,
15  were they also shown to the lawyers for the
16  plaintiffs in this litigation?
17  A. I don't recall. I think I told them that
18  I had done it but I don't recall sharing the letters
19  with them. I just don't remember. I don't think
20  so.
21  Q. The registry we were talking about before
22  the break, the CDC registry that you wrote about CDC
23  establishing in the two MMWR reports. So are we
24  with me what we're talking about, Doctor?
25  A. I think so.



GODFREY OAKLEY, JR., MD
LEJEUNE vs. ABBOTT LABORATORIES

February 21, 2014
73–76

Page 73

1  Q.  Now, had you formulated a reporting form
2  for that?
3  A.  I don't think so.
4  Q.  Had you written out a protocol for how the
5  analysis would be done?
6  A.  We did not.
7  Q.  Did you consult with a statistician to
8  determine how the analysis should be done?
9  A.  We were waiting to see if the cases were
10  coming in.
11  Q.  Had you made any power calculations to
12  determine how many cases you would need to have
13  reported in order to get meaningful data?
14  A.  Usually these registries are open-ended.
15  Q.  So my question was had you made any power
16  calculations to determine how many exposures you
17  would need to have in order to get any meaningful
18  results?
19  A.  We didn't.
20  Q.  Not having done power calculations, had
21  you made any estimate of how many cases you would
22  have to have reported in order to get meaningful
23  results?
24  A.  Anytime we thought about a study one would
25  be thinking of power calculations.  This was a

Page 74

1  registry which you take -- you were just taking as
2  they came and you never know how many are going to
3  come.  For example, we did one with congenital
4  rubella immunizations and we wanted to know how
5  many -- it was actually another part of CDC but we
6  consulted with them -- we'd want to know if there
7  five or if there were ten or if there were 20.  And
8  as it grows, the power becomes better.  And so it's
9  a pretty standard thing to take what comes and make
10  the most sense out of it as you can as it goes
11  along.
12  Q.  I guess my question is a little different.
13  You referred to power calculations in your last
14  answer.  Of course I had it in my question as well.
15  But did you have in mind in the early 1980s how many
16  pregnancies would have to be reported before you
17  would get any meaningful analysis from those
18  reports?
19  A.  As I said earlier, the idea of setting
20  this registry up was the idea to take advantage of
21  exposures that might continue.  Frankly I didn't
22  think there would be very many more exposures.
23  Q.  So you did not have any number of reports
24  in mind that were necessary in order to get
25  meaningful analysis or data from it; is that

Page 75

1  correct?
2  A.  That is correct.
3  Q.  You know that there is an issue in any
4  birth defects registry of sufficient enrollment in
5  order to get meaningful -- in order to make analysis
6  of the results meaningful, correct?
7  A.  Sure.
8  Q.  And what is that issue, Doctor?
9  A.  I am not sure I understand.
10  Q.  What is the issue?  Unless there's
11  sufficient enrollment, why is it that any results
12  from the registry would not result in a meaningful
13  analysis?
14       MS. BRAHMBHATT:  Objection, form.
15  A.  Again I'm not sure that I have gotten your
16  question.
17  Q.  (By Mr. Strain) Have you ever formulated a
18  registry from the beginning, you, Dr. Oakley?
19  A.  I certainly have worked with registries a
20  lot so I know that part of them.  But having
21  established one de novo, no.  I suppose I asked
22  Dr. Lammer to start a registry on Accutane, exposed
23  babies, and he did do that and so on.  But that was
24  mostly his project.
25  Q.  Dr. Lammer's project, not yours?

Page 76

1  A.  Well, he worked for me for a while and
2  then he left and went and worked for Dr. Holmes and
3  then finished the project up there.
4  Q.  Now, how would you go about if you were
5  establishing a registry, which I understand you have
6  not done de novo as you have said, how would you go
7  about doing that?
8  A.  Well, you'd have to find exposures -- are
9  you talking exposure registry or birth defects
10  registry?
11  Q.  What's the difference?
12  A.  Well, the birth defects registry my
13  definition of that is you collect cases of birth
14  defects hopefully that have occurred within the
15  population.  What we did in Atlanta, we tried to
16  find in the confines of metropolitan Atlanta all the
17  babies born with birth defects so we could make a
18  judgment about what the incidence was and whether it
19  was going up or down and it also provided cases to
20  do case control studies which would be what has now
21  around the country are now six or eight of these
22  that worked together in a large collaborative
23  fashion.  That is different from an exposure
24  registry where what you would do is you would find
25  people exposed and then go forward to try to figure



GODFREY OAKLEY, JR.,MD  February 21, 2014
LEJEUNE vs. ABBOTT LABORATORIES  77–80

Page 77
1  out what would be any adverse effects from that
2  exposure.
3    Q. And what was the rubella registry?
4    A. The rubella registry was an exposure
5  registry. It was a registry of women who had
6  been -- who had taken the rubella vaccine while they
7  were inadvertently pregnant.
8    Q. And that was a registry established by
9  CDC?
10   A. It was in the immunization part of CDC,
11 yes.
12   Q. Did any manufacturer provide the funds for
13 that?
14   A. I don't think so.
15   Q. Was any manufacturer asked by CDC to
16 establish a rubella registry?
17   A. I have no idea.
18   Q. It was focused on the rubella vaccine,
19 correct?
20   A. That is correct.
21   Q. The rubella vaccine is manufactured by a
22 pharmaceutical company or companies, correct?
23   A. That is correct.
24   Q. Was it better for CDC to do that as you
25 did or for the pharmaceutical companies to do that?

Page 78
1    A. Either could have --
2        MS. BRAHMBHATT: Objection, form.
3    A. -- done it well. Either could have done
4  it well.
5    Q. (By Mr. Strain) Why did CDC do it?
6    A. CDC has a huge immunization program and
7  lots of money.
8    Q. Now, the Atlanta registry is a birth
9  defect registry, correct?
10   A. It is.
11   Q. You were involved with that for many
12 years, correct?
13   A. That is correct.
14   Q. Is there any exposure registry you were
15 involved with?
16   A. Other than asking Dr. Lammer to set up and
17 collect cases related to Accutane.
18   Q. So other than that, no, you weren't
19 involved -- you didn't have any involvement with an
20 exposure registry; is that correct?
21   A. That's correct.
22   Q. Now, let's talk about the birth defect
23 registry in Atlanta. That was started when, Doctor?
24   A. It started in October of
25 nineteen-eighty -- '67.

Page 79
1    Q. October of?
2    A. '67. Usually it's counted as starting in
3  December -- I mean January 1 of '68 but it literally
4  started in '67.
5    Q. So that was well underway when you came to
6  CDC?
7    A. It was.
8    Q. And you took over the running of it at a
9  certain time when you were at CDC, correct?
10   A. When I first came to CDC I was the person
11 who went out to the hospital and collected records.
12   Q. But who was in charge of the CDC Atlanta
13 registry when you were chief of the Birth Defects
14 Division at CDC?
15   A. Oh, it was under me, sure.
16   Q. Now, did that registry collect drug usage
17 information from the women whose medical information
18 was collected?
19   A. As I had said earlier, it is common for a
20 birth defects registry to provide the cases for a
21 case control study and in fact we used many of the
22 cases to do a case control study.
23   Q. That's not an answer to my question,
24 Doctor. Did that registry collect drug usage
25 information from the women whose medical information

Page 80
1  was collected?
2    A. The Atlanta birth defects registry form
3  was primarily getting the name of the defect and the
4  family name and what was known about what could be
5  gotten from a casual viewer looking at the chart.
6  But the way we looked for to do our etiologic
7  research was primarily through the case control
8  studies.
9    Q. Well, let's look at something from The
10 Lancet in November of '82 I think it is. We'll mark
11 this as the next exhibit which I believe is 12.
12       (Defendant's Exhibit 12 was marked
13 for identification.)
14   Q. (By Mr. Strain) This is a Lancet letter
15 dated November 13, 1982. You're one of the authors
16 of this, Doctor?
17   A. Yes.
18   Q. Did you actually write it?
19   A. I drafted it.
20   Q. You refer both in the chart and in the
21 text of the letter to the Atlanta registry.
22   A. Yep.
23   Q. It says in the chart the Atlanta, that's a
24 reference to the Atlanta registry we've been
25 discussing, right?



800.211.DEPO (3376)
EsquireSolutions.com

Page 89

1  help determine the risk of valproate therapy to
2  women of childbearing years?
3      A.  I would say once it was established as a
4  teratogen, which it was in '82, we thought that was
5  established. And as I had said earlier, we had
6  birth defects registry during these years. We got I
7  think it was a letter from 50 senators to do a study
8  on whether Vietnam veterans caused birth defects or
9  not. We put a lot of energy into doing that. That
10 was a wide-based questionnaire that had many things
11 in it including risk for anticonvulsants, so that
12 was done in that study. But the primary motivation
13 for doing that was the fact that veterans thought
14 that Agent Orange had caused birth defects.
15     Q.  Doctor, in the early part of your answer
16 you said it was established that valproic acid was a
17 teratogen in 1982. Of what significance was that in
18 terms of what you were going to do or not do with
19 the Atlanta registry?
20     A.  Well, to me it meant -- there aren't many
21 human teratogens.
22     Q.  All right.
23     A.  So there was Thalidomide. And along came
24 valproic acid, a new human teratogen. And as sort
25 of a way to just keep up with that we offered to do

Page 90

1  this registry. It didn't go anywhere.
2      Q.  So what difference does it make that it
3  was established as a teratogen? Do you mean it was
4  time then to move on --
5      A.  I thought --
6      Q.  -- to other things?
7      A.  -- the drug should come off the market.
8          MS. BRAHMBHATT: Let him finish.
9          THE WITNESS: I'm sorry.
10     Q.  (By Mr. Strain) What did you mean then it
11 was established as a teratogen, Doctor? Does it
12 mean then that it wasn't necessary to do further
13 work at CDC with your registry about valproic acid?
14     A.  We were a birth defects registry. That
15 was our primary issue. We did at that time not have
16 work in developmental disabilities. And so, you
17 know, our focus was on birth defects. And we didn't
18 know what we might learn from a registry like that
19 but if we had it in place we might learn some more
20 things.
21     Q.  But Doctor, you didn't use the Atlanta
22 registry to attempt to determine more things about
23 valproic acid, did you?
24     A.  That's not true.
25     Q.  How did you use it?

Page 91

1      A.  It is a birth defects registry. It is not
2  an exposure registry. So a birth defects registry
3  starts with birth defects and we can learn about
4  potential risk factors for birth defects. But it
5  wouldn't tell us anything about spina -- about
6  cerebral palsy or mental retardation or loss of IQ
7  points or autism or other things. But if you had an
8  exposure registry, then you added people who were
9  exposed and you can follow them up for many
10 different outcomes including birth defects.
11     Q.  Did you use the Atlanta registry in any
12 way to determine birth defect risk from valproate
13 usage? And if so, how?
14     A.  I believe that in the last five years the
15 expanded network of birth defect surveillance
16 programs has published a paper looking at the risk
17 for spina bifida or for birth defects in valproic
18 acid and they found the association again with
19 spina bifida. And I think there's a paper there
20 that estimated sort of 40 or 50 patients with
21 valproic acid a year caused spina bifida.
22     Q.  So you said that was in the last five
23 years, so let me modify my question. You left the
24 CDC in 1988, correct?
25     A.  That's correct.

Page 92

1      Q.  Were you chief of the Birth Defects
2  Branch --
3      A.  I was.
4      Q.  -- until you left?
5      A.  I was.
6          MS. BRAHMBHATT: Let him finish the
7      question.
8      Q.  (By Mr. Strain) While you were chief of
9  the Birth Defects Branch until 1998, did you use the
10 Atlanta registry to determine and to find out
11 anything about birth defects with valproic acid?
12     A.  We were collecting data in the Atlanta
13 situation -- in the Atlanta area and in five other
14 different states. And in collecting -- doing a case
15 control study on those I collected various
16 information. And as I said, it is a while before it
17 gets analyzed. And there was an analysis after I
18 left CDC from this exposure -- from this birth
19 defects registry in which we were collecting
20 exposure data.
21     Q.  Is this right: Though you were working on
22 that since 1982, you did not have the data gathered
23 and analyzed in time to publish it before 1998; is
24 that correct?
25     A.  No.



GODFREY OAKLEY, JR.,MD  
LEJEUNE vs. ABBOTT LABORATORIES

February 21, 2014  
101–104

Page 101

1  since then. And so I don't think I could give you
2  an answer today.
3    Q. Well, did you recommend that the
4  manufacturer of Valium establish an exposure
5  registry?
6    A. Well, when we were publishing not this
7  paper but The Lancet paper I did call the scientific
8  director of Roche at the time and tell him we were
9  publishing this paper and I was absolutely floored
10 that the most widely-prescribed prescription in the
11 world they didn't have any exposed pregnant women in
12 it to help us inform this decision. That was when I
13 first thought why do not drug companies when they're
14 going to use a drug that's widely exposed identify
15 cohorts of women that have been exposed so they have
16 in their own data data that can be compared to
17 people who come up with a hypothesis.
18   Q. In that answer you mean you were floored
19 to find out that in their clinical trials of Valium
20 there have not been -- pregnant women have not
21 been enrolled?
22   A. That's not what I said.
23     MS. BRAHMBHATT: Objection, form.
24   Q. (By Mr. Strain) What did you mean then?
25   A. What I said was this drug, which was

Page 102

1  widely marketed, when I asked them if they had an
2  exposure registry or had any women and knew what the
3  rates of birth defects were among women that were
4  exposed, they said no. And from that moment on I
5  thought why in the world would a drug company sell a
6  drug that was going -- that women who would get
7  inadvertently pregnant not find out what happened to
8  those pregnancies so that when someone raised a
9  hypothesis like Safra and Oakley, they would have
10 their own data to be able to say this is what we
11 found or not found. But it just wasn't part -- it
12 didn't happen. It wasn't there.
13   Q. Did you recommend to Roche pharmaceutical
14 company they start an exposure registry for Valium?
15   A. Roche on its own decided to go to the
16 people in Boston to test this hypothesis in a
17 different set. Absolutely they did that, yes.
18   Q. In a what?
19   A. In a case control study in Boston. They
20 went and paid -- and actually funded it. And I was
21 on an advisory committee in which that study as
22 done.
23   Q. And what did that study determine?
24   A. That study turned out to be negative.
25   Q. Did Roche establish a pregnancy registry,

Page 103

1  an exposure registry?
2    A. That I don't know.
3    Q. Did you recommend that they do so?
4    A. I didn't recommend that they do so, no.
5    Q. Why not?
6    A. We were trying to settle the question of
7  whether this is a human teratogen or not a human
8  teratogen and the most efficient way to do that was
9  to do a case control study.
10   Q. Did you believe that a manufacturer
11 pregnancy registry for Valium would provide useful
12 and important information?
13   A. I think it could have, yes.
14   Q. And so why didn't you recommend that Roche
15 establish that? You've already said it was the
16 largest-selling drug in the world.
17     MS. BRAHMBHATT: Asked and answered.
18   Objection, form.
19   A. I don't know.
20   Q. (By Mr. Strain) When did you first have
21 any experience with a manufacturer-sponsored or
22 created exposure registry? Was that the rubella --
23 no, I'm sorry, that wasn't the rubella. So the
24 question is when did you first -- I'm starting
25 over -- when did you first have any experience with

Page 104

1  or involvement with a manufacturer-sponsored
2  exposure registry for the manufacturer's drug?
3    A. I suppose it was with Dr. Cragen's work
4  with probably first one of the AIDS drugs.
5    Q. And when was that?
6    A. I can't tell you exactly but in the
7  eighties sometime I would guess.
8    Q. So other than the AIDS drugs -- and that
9  was Dr. Cragen, not you; is that right?
10   A. Yeah. She worked for me but she was the
11 one that took that on, yes, and Dr. Cordero who
12 worked for me for a while was involved. I mean at
13 the CDC we had the issue of they were using drugs to
14 treat AIDS, using drugs to treat VD, we thought they
15 ought to be looking at whether they caused birth
16 defects or not.
17   Q. When else did you have any involvement
18 with a manufacturer-sponsored exposure registry of
19 one of its drugs?
20   A. I don't think that I did. As I said
21 earlier, when this paper came up it was crystal
22 clear to me there would be a very good idea if they
23 had them but I didn't think it was my job
24 necessarily to build that. I mean I would have been
25 happy -- I talked around with -- I would have been



800.211.DEPO (3376)  
EsquireSolutions.com

GODFREY OAKLEY, JR., MD  
LEJEUNE vs. ABBOTT LABORATORIES  
February 21, 2014  
105–108

Page 105

1 happy if the drug companies had said hey, come to
2 CDC and do these registries. They didn't do that.
3 They didn't do it themselves.
4  Q. So when you say this paper in that last
5 answer, you referred to and pointed to Exhibit 13 --
6  A. Yes.
7  Q. -- about Valium --
8  A. Yes.
9  Q. -- correct?
10    Other than the AIDS drugs what
11 manufacturer-sponsored registries of drugs existed
12 in the eighties or nineties?
13  A. I don't know.
14  Q. Did any others exist --
15  A. They may have.
16  Q. -- in the eighties --
17  A. They may have.
18  Q. -- or nineties?
19    MS. BRAHMBHATT: Let him finish.
20    THE WITNESS: Sorry.
21    (A recess was had.)
22  Q. (By Mr. Strain) Did you determine that
23 Diazapam may be a teratogen?
24  A. We certainly identified an association and
25 raised that question.

Page 106

1  Q. Is Diazapam a teratogen?
2  A. I think it is still unresolved. But I
3 haven't looked at the data in a very long time.
4  Q. Who manufactures Diazapam?
5  A. Roche.
6  Q. Did you ask Roche to start a registry
7 about Diazapam?
8  A. I did not.
9  Q. And why didn't you?
10  A. Because they decided to undergo some
11 studies in Boston and that was a reasonable first
12 step.
13  Q. Well, there were studies. Did you believe
14 it would have been a good idea for them to have a
15 registry in addition to studies?
16  A. Yes, I think it would have been a good
17 idea. From the very time they first issued -- they
18 were first approved to sell the drug I believe they
19 should have had a registry of exposed pregnant
20 women.
21  Q. Did you believe that as to all drugs to be
22 used by pregnant women?
23  A. I do.
24  Q. Valproate, Valium, Diazapam, Tegretol,
25 phenobarbital, all of them, correct?

Page 107

1  A. Every one of them.
2  Q. How many do?
3  A. I don't know.
4  Q. So there must be what, 50, a hundred, 200
5 drugs used by pregnant women?
6  A. Yes.
7  Q. You believe all of them should have a
8 pregnancy registry?
9  A. That's the most effective way to find
10 adverse effects from a new drug being introduced.
11  Q. So how many of those many, many, many
12 drugs used by pregnant women do have pregnancy
13 registries?
14  A. I don't know the answer to that question.
15  Q. Do any drugs used by pregnant women
16 introduced in the 1980s have a pregnancy registry?
17  A. I don't know the answer to that question.
18  Q. You never worked for a pharmaceutical
19 company, correct?
20  A. That is correct.
21  Q. And you never received any information
22 about what sales representatives do or their
23 training or anything like that, correct?
24  A. I don't recall any.
25  Q. And you have no knowledge of what the FDA

Page 108

1 regulations are concerning what sales
2 representatives are permitted to do or not permitted
3 to do, correct?
4  A. That's correct.
5  Q. Do you have any knowledge of what the
6 educational background is of sales representatives
7 generally?
8  A. Just from the few I know they usually have
9 college degrees.
10  Q. Usually have?
11  A. College degrees.
12  Q. But they're not healthcare professionals?
13  A. I don't know how they would describe
14 themselves.
15  Q. Can you give me an example of any
16 manufacturer of a product who's used its sales
17 representatives as part of a pregnancy exposure
18 registry?
19  A. It seems to me that those people who are
20 in doctors' offices could have for a relatively
21 small part of their time identified exposed women.
22  Q. I'm just asking the question -- we'll get
23 to that -- the question was can you give me an
24 example of where that's ever been done?
25  A. I'm not aware of it.

GODFREY OAKLEY, JR., MD  
LEJEUNE vs. ABBOTT LABORATORIES

February 21, 2014  
117–120

### Page 117

1   Q.  (By Mr. Strain) Dr. Oakley, you never
2   wrote down anything about the parameters or rules or
3   protocol or outline of the registry that you propose
4   Abbott should have done in the eighties or nineties,
5   correct?
6       A.  That is correct.
7       Q.  And you never calculated how many people
8   would have to be enrolled and how many women using
9   valproate monotherapy in the first trimester would
10  have had to be enrolled to get meaningful
11  information, correct?
12          MS. BRAHMBHATT:  Objection, form.
13      A.  That's correct.
14      Q.  (By Mr. Strain) Did you ever calculate how
15  long it would have taken to get sufficient
16  enrollment to get meaningful information?
17      A.  I did not.
18      Q.  And do you know how long it would have
19  taken without having calculated it to get sufficient
20  enrollment to get meaningful information?
21      A.  No.
22      Q.  And I think you've already said you never
23  designed a pharmaceutical company exposure registry,
24  correct?
25      A.  That's correct.

### Page 118

1       Q.  And you never designed any registry for
2   the CDC or for anybody else specific to a given
3   drug, correct?
4       A.  You mean an exposure --
5           MS. BRAHMBHATT:  Objection, form.
6       A.  You mean an exposure registry?
7       Q.  (By Mr. Strain) Yes, sir.
8       A.  That's correct.
9       Q.  And the only effort to do so was the
10  effort we've talked about described in the two MMWR
11  publications in '82 and '83, correct?
12      A.  Would you say that again.
13      Q.  The only effort you were involved in to
14  create an exposure registry of a specific drug was
15  what we have talked about in the two MMWR sheets in
16  1982 and 1983, correct?
17      A.  No.  As I said earlier, I asked Ed Lammer
18  to try to find kids that had been exposed to
19  Accutane and follow them up.
20      Q.  Other than that?  But I think you've made
21  clear that was Dr. Lammer's project, not yours?
22      A.  But he was under me when it got started
23  and I certainly was happy to see him do that.  And
24  the ideas of starting it were to find out what we
25  can find out about this exposure.

### Page 119

1       Q.  Did you have involvement or did you
2   supervise or review Dr. Lammer's work --
3       A.  In the first part --
4       Q.  -- in that rubella registry?
5       A.  Dr. Lammer was not involved in the rubella
6   registry.
7       Q.  Excuse me, the Accutane registry.
8       A.  Yeah.  Yes, I was his supervisor for -- he
9   worked under me for probably the first year that he
10  worked on it but not the last two years.
11      Q.  Well, what was your personal involvement?
12      A.  I said I agreed that this registry ought
13  to be -- that he thought to go find as many people
14  as he could that had been exposed to this drug and
15  try to learn what we could learn from those people.
16      Q.  Have you done any calculation of what the
17  likely result would have been if Abbott had started
18  a registry of the kind you proposed in the 1980s or
19  nineties?
20      A.  I have entertained that thought in
21  thinking about how big you would have to expose a
22  1 percent event, you know, it would be nice to have
23  500 to a thousand.
24      Q.  And have you determined what the result
25  would have been if Abbott had established such a

### Page 120

1   registry as you recommend?
2           MS. BRAHMBHATT:  Objection, form.
3       A.  I don't know how to answer that question.
4   Ask again, please.
5       Q.  (By Mr. Strain) What would the result have
6   been if Abbott had established a registry of the
7   kind you recommended back in the 1980s?
8       A.  The recommendation is if it is established
9   when the first prescription is written, it would
10  decrease the time at which the public health and
11  physicians community would know that the drug caused
12  spina bifida.  It could have been found out before
13  1982, you know, if it had been established in France
14  in 1967.  So those registries would have found it
15  earlier than it was found.  We did find it.  We
16  might not have ever found it if it hadn't been for
17  the widespread use in France.
18      Q.  So the registry you recommend would have
19  been a spina bifida registry --
20      A.  No.
21      Q.  -- is that correct?
22      A.  I'm sorry.  I interrupted again.
23      Q.  What would it have been?
24      A.  It would have been -- it would have been
25  an exposure registry in which ideally with women



GODFREY OAKLEY, JR., MD  
LEJEUNE vs. ABBOTT LABORATORIES

February 21, 2014  
125–128

### Page 125

1 compare what one manufacturer could do in a registry  
2 with what EUROCAT did based on a group of  
3 government-funded registries in Europe. Can you  
4 explain that to me.  
5     A.  I can try. The European registries are  
6 like the Atlanta registry, they counted babies with  
7 birth defects and then they have to find out about  
8 the exposure. If you started the other way, you'd  
9 start out and you'd have your indication of the  
10 exposure and you would follow those people up. And  
11 you would have to have a lot of exposed people, no  
12 question about that.  
13     Q.  Did you have any involvement in the NEAD  
14 study?  
15     A.  I don't think I had any involvement  
16 although I may have been a reviewer on behalf of NIH  
17 at some time during one of the projects that  
18 Dr. Holmes worked on.  
19     Q.  The NEAD study is where you're referring  
20 to Dr. Holmes' study?  
21     A.  Maybe I got the acronym wrong, so please  
22 tell me.  
23     Q.  I'm not talking about the North American  
24 antiepileptic drug registry. Was there a study --  
25     A.  You are or you are not?

### Page 126

1     Q.  I'm not.  
2     A.  I'm sorry.  
3     Q.  Was there a study run out of Emory  
4 University with which you're affiliated called the  
5 NEAD study of cognitive impact of antiepileptic  
6 drugs?  
7     A.  Yes.  
8     Q.  Did you have any involvement with that  
9 study?  
10     A.  I did not.  
11     Q.  And who was the principal investigator on  
12 that study?  
13     A.  Dr. Meador.  
14     Q.  I guess in your field, Doctor, your being  
15 at Emory I'm surprised you didn't have any  
16 involvement. Why was that?  
17     A.  Well, he was the PI. I think he actually  
18 started that study before he came to Emory.  
19     Q.  And when did he come to Emory?  
20     A.  I would guess about ten years ago but I  
21 don't know. I was there several years before I met  
22 him.  
23     Q.  And you've been there since '98; is that  
24 correct?  
25     A.  Yes.

### Page 127

1     Q.  How long did it take for Dr. Meador and  
2 others working on that to get a sufficient number of  
3 enrollees to get meaningful results?  
4     A.  I don't know.  
5         MS. BRAHMBHATT:  Objection, form.  
6     Q.  (By Mr. Strain) Are you able to describe  
7 that study to us, Doctor?  
8     A.  I could tell you some things about it.  
9     Q.  Please do.  
10     A.  Well, it was an attempt to find women that  
11 had been exposed to monotherapy I guess before  
12 anticonvulsants and to attract those and to follow  
13 the outcomes of those pregnancies.  
14     Q.  Did the Atlanta registry with which you  
15 were involved, did that gather information about  
16 cognitive development?  
17     A.  No.  
18     Q.  Did the 1,200 hospital registry with which  
19 CDC was involved gather information about cognitive  
20 development?  
21     A.  No.  
22     Q.  And why didn't the Atlanta registry gather  
23 information about cognitive development?  
24     A.  It was a small operation. Its idea was to  
25 do birth defects surveillance. There had been the

### Page 128

1 Thalidomide epidemic which you must be aware of.  
2 That prompted us putting into place a birth defects  
3 registry trying to look for the next epidemic of an  
4 environmental agent. Subsequently to that we set up  
5 a different program that does relate to cerebral  
6 palsy and mental retardation.  
7     Q.  And when did you set that up?  
8     A.  In the middle eighties I think it was.  
9     Q.  The CDC did?  
10     A.  Yes.  
11     Q.  And what was the registry called?  
12     A.  It has an acronym NASPA, N-A-S-P-A I think  
13 it was.  
14     Q.  And please describing that registry for  
15 me.  
16     A.  It was a registry based on school records  
17 is where the case ascertainment was and it was for  
18 mental retardation, cerebral palsy, blindness,  
19 deafness. I've missed one which I've just  
20 forgotten. And later this group of people added  
21 autism.  
22     Q.  Was it an attempt to determine the causes  
23 of cerebral palsy and mental retardation and  
24 blindness and deafness?  
25     A.  Yes.



GODFREY OAKLEY, JR.,MD  
LEJEUNE vs. ABBOTT LABORATORIES  

February 21, 2014  
141–144  

Page 141

1   Q.  Can you tell me any company that did that
2 about a prescription drug back in the eighties?
3   A.  I would be uninformed on that.
4   Q.  Can you tell me any company that did that
5 about a prescription drug in the 1990s?
6   A.  But again, it is not something that I'm
7 really fully informed on. But I don't have any -- I
8 don't know of any but there might be.
9   Q.  Can you tell me of any registry at all,
10 whether prescription drug or not, in the eighties or
11 nineties that attempted to determine the cognitive
12 impact of any environmental factor of children born
13 and then follow them through ages two, three, five,
14 six, or older?
15   A.  Yes.
16   Q.  What's that, please?
17   A.  So the collaborative perinatal study was
18 done in the late sixties and cohortive 50,000
19 pregnancies were assembled and they were followed
20 through until at least age five. I don't know how
21 much longer. And there were sort of case
22 control-like analyses done out of that.
23   Q.  What study did you say that was?
24   A.  It was the collaborative perinatal study
25 it was called, the National Collaborative Perinatal

Page 142

1 Study. It was run out of NIH. And the kids or the
2 births were I think mid to late seventies and they
3 were followed up and there were studies written
4 about the IQ of these kids at five years and so on.
5   Q.  But that was a government-funded NIH
6 study?
7   A.  It was, yeah.
8   Q.  Did that study attempt to determine the
9 effect of environmental factors such as prescription
10 drugs on IQ?
11   A.  I don't know all the things that they did.
12 It was a large study and there were many, many, many
13 papers published out of that. And I would be
14 surprised if there weren't but I don't know the
15 answer.
16   Q.  Well, did that study lend itself to
17 determining the effect on IQ of antiepileptic drug
18 usage?
19   A.  It would be a function of how much
20 exposure it was in that cohortive 50,000. And
21 without knowing that, I can't do anymore.
22   Q.  Well, you have suggested that Abbott
23 should have had a registry to determine cognitive
24 impact way back in the eighties; is that your
25 opinion?

Page 143

1   A.  My opinion is that an exposure registry of
2 women -- pregnant women exposed to valproic acid
3 could have been set up in 1965 when the drug was
4 first put on the market in France and those children
5 followed up appropriately. We'd have learned things
6 sooner than Meador learned them in the last ten
7 years. If we'd have done that, we would have found
8 it sooner.
9   Q.  Now, if you had done what Meador did?
10   A.  Kim Meador.
11   Q.  Kim Meador?
12   A.  Yes.
13   Q.  Is that what in your opinion Abbott should
14 have done --
15   A.  I don't see why not.
16   Q.  -- a study like -- excuse me.
17   A.  Sorry.
18   Q.  A registry just like Meador?
19   A.  I don't see any problem with having set up
20 a forward-going exposure registry and then you'd
21 have to decide what would be the control groups and
22 yes, they'd have -- whether it be exactly the same
23 kind of study. I doubt it would be exactly the same
24 kind of study, but it certainly could be something
25 rather similar to it.

Page 144

1   Q.  Now, why do you doubt it would have been
2 exactly the same kind of study?
3   A.  Because two people don't usually design
4 the same studies. Two different people would have
5 different ...
6   Q.  You have just used the term Meador study.
7 Meador really did a study rather than a registry,
8 correct?
9   A.  Well, he attracted -- as I understand it
10 he attracted women who were exposed in pregnancy to
11 these four drugs and then he wanted to have a
12 control group but NIH wouldn't fund a control group
13 so we didn't have a normal control group. That's
14 why he makes these comparisons between the other
15 monotherapy.
16   Q.  Why didn't NIH fund the control group?
17   A.  I have no idea. They thought -- I don't
18 know.
19   Q.  But he simply went around the
20 Massachusetts area hospitals to identify patients
21 who had used antiepileptic drugs during pregnancy,
22 correct?
23   A.  Let's make sure we got the right guy. So
24 we're talking the guy from Emory, right?
25   Q.  Yes.



GODFREY OAKLEY, JR., MD
LEJEUNE vs. ABBOTT LABORATORIES

February 21, 2014
157–160

Page 157

1  effects on their drug.
2      Q.  You don't know whether other drug
3  companies would have been willing to participate?
4      A.  I do not know that.
5      Q.  In the study that you believe Abbott
6  should have undertaken in the 1980s, would that have
7  been one study for birth defects and cognitive
8  impact or two different studies?
9      A.  Well, it would be an exposure registry.
10  And so if you define this as an exposure registry,
11  it is an exposure registry and you go look at
12  multiple outcomes.
13      Q.  Well, then I have to ask you whether
14  there's any precedent for that, Doctor.  The Holmes
15  study, the North American antiepileptic drug
16  registry study is only a birth defects and not
17  cognitive impact, correct?
18      A.  I'm not sure that's true.  He certainly
19  has the capacity to look at cognitive issues if he's
20  been interested in cognitive issues.
21      Q.  So you think Dr. Holmes's group gathered
22  information on cognitive impact at age one year,
23  three years, five years, and the rest?
24      A.  I don't remember the details.  But I am
25  unwilling to say he didn't do it.  I would think

Page 158

1  they might have done that I don't know.
2      Q.  Well, if he did it, why was it necessary
3  for Meador to do it?
4          MS. BRAHMBHATT:  Objection, form.
5      A.  Again I have not reviewed recently all of
6  the stuff out of that study.  So you asked that
7  question and I tried to answer the best I could.
8      Q.  (By Mr. Strain) I wonder if you'd tell me
9  this, Doctor:  Can you give me one example of a
10  study of antiepileptic drugs that measured both
11  cognitive impact and birth defects?
12      A.  I think that Meador identified in his
13  study spina bifida.  I have to go back and -- not in
14  this paper but in a different paper because I know
15  he's told me that early on in conversation but I
16  don't remember the paper.  But the point is if you
17  have got an exposure registry, whatever question
18  comes up about an outcome, you can ask it.  If you
19  start with an outcome registry, you can ask about an
20  infinite number of exposures.
21      Q.  I'm just asking, Doctor, whether you could
22  give me any precedent for that having been done both
23  birth defects and cognitive impact in the same
24  study?
25      A.  The collaborative perinatal study did that

Page 159

1  forever.
2      Q.  Any others?
3      A.  The atomic bomb study did it.
4      Q.  The atomic bomb study and the
5  collaborative perinatal study.  Any others?
6      A.  Yes.  I mean they're both exposure studies
7  and they could go out.
8      Q.  Any others?
9      A.  I haven't exhaustively tried to answer
10  that question.  There probably are others but I
11  don't know exactly what they are.
12      Q.  They were both government-funded studies,
13  correct?
14      A.  They were.
15      Q.  Can you give me any example of a
16  privately-funded by a pharmaceutical company or
17  anybody else study that measured both birth defects
18  and cognitive impact?
19      A.  I know that Roche hired guys in Boston to
20  do Accutane.  And how far they followed them I don't
21  know but they certainly had the possibility once
22  they've identified women who were exposed to
23  Accutane in pregnancy to follow their kids.  And I
24  actually think maybe there were some cognitive
25  studies done in that but I'm not certain.

Page 160

1      Q.  Are you prepared to tell me whether the
2  study you believe Abbott should have done is similar
3  to the study that was done on Accutane or different?
4      A.  It would be similar in the fact that you'd
5  have to try to find exposed women during their
6  pregnancy and then follow them up.  And Roche made a
7  fairly large attempt to do that as I understand it.
8      Q.  I'm just looking for something, Doctor, in
9  the definition of what you say Abbott should have
10  done if you can identify a study and tell me Abbott
11  should have done that study.
12      A.  Well, what I think Abbott should have done
13  was to sit down in 1982 and say we have a drug that
14  causes birth defects, shouldn't we find out, if
15  we're going to continue to keep this drug on the
16  market, shouldn't we try to find out if it has any
17  other adverse effects.
18      Q.  Not my question, Doctor.  I'm asking if
19  you can point to a study that you can say Abbott
20  should have done a study just like that and that
21  would give me definition, concreteness to what
22  you're suggesting Abbott should have done.  Can you
23  point to such a study?
24      A.  There are plenty of exposure registries
25  and it would be easy for somebody to pick up and do

