# EXHIBIT 7

GODFREY P. OAKLEY, JR., M.D.
D.W.K. vs. ABBOTT LABORATORIES, INC.,

October 16, 2014
5–8

Page 5

1   Q.   You can hold on to that for now.
2   A.   Okay.
3   Q.   Have you seen this document before today?
4   A.   I believe so, yeah, sure.
5   Q.   Including its list of documents and
6   things --
7   A.   Yep.
8   Q.   -- to be produced?
9   A.   Yep.
10   Q.   Okay.  The other commitment we need to
11   make to one another -- and I saw this a bit in the
12   prior transcript -- is it's important to keep Kara
13   from kicking one or both of us that we not talk over
14   one another.
15   A.   Okay.
16   Q.   Okay?
17   A.   Yep.
18   Q.   I'll try real hard to let you complete
19   your answer before I move on to the next question.
20   If you could do the same to me in reverse.
21   A.   Thank you.  Yep, yep.
22   Q.   Thanks.
23   A.   Holler if I screw up.  Okay?
24   Q.   Okay.
25   A.   Sorry if I --

Page 6

1   Q.   There won't be any hollering, but we'll
2   work it out.
3         All right.  So in response to the list of
4   documents and things that's included in Exhibit 1,
5   you arrived here with your counsel this morning or
6   plaintiff's counsel this morning with three different
7   documents, four different documents that she handed
8   to me.  And I'd like to just get those on the record
9   so we don't forget that housekeeping matter.
10        Because of the way I've numbered them, let
11   me say that we've marked as Exhibit 2 to the
12   deposition your October 1st report.
13   A.   No. 2 is my report.
14   Q.   No. 2 is your report.
15        No. 3 is an article entitled Acyclovir in
16   Pregnancy Registry.  It is dated August 29th, 1988,
17   according to the footer and appears to have been
18   published in the American Journal of Medicine.  It's
19   Pages 123 through 128 of Volume 85.
20        Would you agree with that?
21   A.   Yep.
22   Q.   Okay.  So hold on to that one for me, if
23   you would.
24   A.   Okay.
25   Q.   Exhibit 4, as we've marked it, is a

Page 7

1   June 1st, 2011 letter from you to Patricia Giordano
2   in connection with a plaintiff or a person by the
3   name of Gabrielle Bowman; is that correct?
4   A.   That is correct.
5   Q.   All right.  And Exhibit 5, as numbered, is
6   a March 12th, 2013 letter, also to Ms. Giordano, also
7   in connection with Gabrielle Bowman.
8        If I could get you to confirm that.
9   A.   Correct.
10   Q.   All right.  And then Exhibit 6 is a report
11   that was prepared on your behalf or by you in
12   connection with litigation pending in Great Britain;
13   is that correct?
14   A.   That's correct.
15   Q.   And this was the report that was
16   addressed, in brief at least, at your last depo and
17   was requested by my partner Mr. Strain and provided
18   by counsel to us in the interim.
19        So I just want to make sure that, to your
20   recollection, this is the report that you mentioned
21   and that Mr. Strain asked for at your last depo.
22   A.   My recollection, yes.
23   Q.   Okay.  And then the last of these
24   pre-numbered exhibits that we have is two pages of
25   time records that I understand from Ms. Brahmbhatt

Page 8

1   are a supplementation of Exhibit 3 to the last
2   deposition.
3        Is that an accurate description of those
4   two pages?
5   A.   That is correct.
6   Q.   Okay.  Let's start with the last one.  Why
7   don't you put Exhibit 7 on top?
8        And I don't have a copy of that.  So my
9   apologies for leaning over on you.  I can read upside
10   down.  That's fine.  Tell me what records -- oh,
11   thank you very much.
12        Ms. Brahmbhatt has just provided me with
13   an additional copy.
14        Exhibit 7, I take it, reflects all the
15   additional time you've billed to the Depakote matters
16   pending in the U.S. through these sets of counsel
17   since your deposition was taken in the Bonner LeJeune
18   case on February 21st, 2014?
19   A.   I haven't billed anybody yet, but that's
20   the time sheet.
21   Q.   Okay.  So have you billed anybody for the
22   time reflected in Exhibit 3 to the prior depo?
23   A.   I have not.
24   Q.   Okay.  Do you expect to?
25   A.   I do.



GODFREY P. OAKLEY, JR., M.D.                                October 16, 2014
D.W.K. vs. ABBOTT LABORATORIES, INC.,                              13–16

Page 13

1    Q.   Okay.
2    A.   Let's see.  Around four and a half hours,
3    something like that.
4    Q.   It looks like it's approaching five.
5    A.   Okay.
6    Q.   Four hours, 50 minutes.
7    A.   Okay.  Something like that.
8    Q.   And that was doing what?
9    A.   I spent the morning reviewing the previous
10   depositions and the things you asked for and my
11   current report and the Riddick report.  So I reread
12   those and tried to get up to speed on those.
13   Q.   Did you meet with counsel at all?
14   A.   I did after 2:30.  The 2:40 there, the
15   2:40 to 4:30, I was with counsel.
16   Q.   Okay.  You made reference again to my list
17   of things to be produced.
18        Did you see anything in this list that
19   would have called for documents that you're aware of
20   the existence of but you were unable to produce them
21   for one reason or another?
22   A.   I don't think so.
23   Q.   Okay.  I'm not suggesting that there would
24   be.  Just wanted to make sure.
25        We had added a couple of things.  In

Page 14

1    particular I'm looking, Doctor, at No. 18.
2    MS. BRAHMBHATT:  What exhibit?
3    Q.   (By Mr. MacWilliams)  No. 18 in here which
4    was any documents you have relating to the events of
5    1982-'83 involving Dr. Robert and your activities or
6    communications relating to those events.
7        Do you have any documents meeting that
8    description?
9    A.   I have no documents that I'm aware of that
10   I have.  You know, it's been a long time ago; and I
11   certainly don't have them that I'm aware of.
12   Q.   Okay.  No. 19, which is a new one, is any
13   documents reflecting any contact you've had with
14   Abbott regarding Depakote.
15        Do you have any such documents?
16   A.   I don't believe so.
17   Q.   If we changed that Abbott to AbbVie, does
18   that change your answer to that question?
19        So Abbott Labs spun off AbbVie
20   January 21st, 2013.  So I actually represent two
21   corporate entities, Abbott Laboratories, Inc., and
22   AbbVie.  And I didn't put AbbVie in there; but it's
23   in the definition of Abbott earlier in the subpoena,
24   I'm sure, or should have been.
25   A.   Yeah.

Page 15

1    Q.   But I just want to check.
2        Have you had any contact with AbbVie?
3    A.   Not that I'm aware of.
4        I mean there may have been some contacts
5    in '82 that I just don't recall.  I know they came to
6    my boss's office.  But you know about that.  We've
7    told you that.
8        If there was any other than that, I am
9    sort of unaware of --
10   Q.   Blissfully unaware?
11   A.   Huh?
12   Q.   Blissfully unaware of those?
13   A.   Yeah, I suppose.
14   Q.   All right.  Well, thanks for going through
15   that list with me.
16        All right.  Can we take a look at
17   Exhibit 3?
18   A.   Yes.
19   Q.   What is it that caused you to bring
20   Exhibit 3 with you to today's deposition?
21   A.   I thought in the previous deposition there
22   were questions I was asked repeatedly, I thought,
23   about was it possible to do a pregnancy registry.
24        And I thought this paper showed that it
25   was.  In fact, Burroughs Wellcome took on its own to

Page 16

1    set up a pregnancy registry in a way of trying to
2    assure the safety of acyclovir or if there were to be
3    a problem to be on top of it.
4        And so I thought as an example about the
5    time -- '84 when they started it.  It's about the
6    time of '82 that suggests it could be -- it certainly
7    could be done.
8    Q.   Okay.
9    A.   And so that's why I put it in.
10   Q.   Thank you.
11        You mentioned -- you used the term
12   pregnancy registry, and I was hoping that you could
13   help me get straight the multiple different
14   registries that I've seen in the various transcripts.
15        So let me list them first, and we'll take
16   it from there.
17   A.   Okay.
18   Q.   I've seen the term pregnancy registry,
19   I've seen the term exposure registry, and I've seen
20   the term birth defects registry.
21   A.   Okay.
22   Q.   Are there any others that we should add to
23   the list of the registries that you expect to talk
24   about in connection with these cases?
25   A.   I suppose that there were -- there are epi



GODFREY P. OAKLEY, JR., M.D.                              October 16, 2014
D.W.K. vs. ABBOTT LABORATORIES, INC.,                          17—20

Page 17

1   methods like case-control methods.  Case control and
2   cohort are terms that come up.  I don't know where
3   the -- I mean not -- case control and, yeah, cohort.
4        Q.    Okay.  So there's other terminology that's
5   related to this subject matter that --
6        A.    Yep.
7        Q.    -- we might get into.
8             But, in terms of the types of registries
9   that could or might be put in place to track these
10  kind of issues or help investigate the types of
11  issues we're talking about, pregnancy registry,
12  exposure registry and birth defects registry more or
13  less covers the waterfront?
14       A.    I think so.
15       Q.    All right.  Can you give me working
16  definitions that I should understand for each of
17  these -- and starting with pregnancy registry -- what
18  it means and maybe distinguish between the three?
19       A.    Could I start with the birth defects one
20  first?
21       Q.    Perfect.  That's fine.
22       A.    I spent most of my time with birth defects
23  registers.
24       Q.    Registries or registers?
25       A.    Well, there are many of them around the

Page 18

1   country and around the world.  So the birth defects
2   registries, you know, I have -- I was -- there was
3   one directly in the unit I was in Atlanta.
4        Q.    Right.
5        A.    And we did business with some of the
6   others that occurred around the country later.
7        Q.    Okay.  I was actually detecting a
8   difference between the word registry and register.
9             Is there a functional difference --
10       A.    Not that I --
11       Q.    -- between those two terms?
12       A.    I don't think so, no.
13       Q.    Okay.  So if we said -- and we've got to
14  make sure we don't talk over each other.
15       A.    Yep.  Sorry.  Thank you.
16       Q.    If we said birth defects registry, that
17  would be synonymous with birth defects register for
18  our purposes here today?
19       A.    I believe that to be true.
20       Q.    Okay.  And I got you off track.  So I'll
21  let you continue.
22            Tell us about what it means to establish a
23  birth defects registry as compared to these other two
24  terms we're going to talk about.
25       A.    So a birth defects registry, you count

Page 19

1   babies with birth defects.  And people do it in
2   different ways.
3             The one I worked on in its early days was
4   a direct result of the thalidomide epidemic.  And the
5   raison d'être for the surveillance system was to
6   provide hopefully an early warning system were there
7   to be another drug that caused an epidemic.  So
8   that's one of its uses.
9             It also provides the use -- provides the
10  opportunity to do what we call case-control studies.
11  And they can be of various formats, but in short they
12  basically get exposure information after the case has
13  occurred and compare that with a control.
14            And that is the most common way which
15  adverse effects from drugs are discovered whether
16  it's a birth defect issue or whether it's a
17  cardiovascular issue or a -- whatever it is they
18  almost -- not all but almost all from cases in
19  case-control studies.
20            So registries give -- you do two basic
21  things in a registry.  One is you count and monitor.
22  Let's say we had 100 birth defects that we count.
23  And we could monitor by month, by year, by quarter.
24  In the registries around the U.S., we had one while I
25  was there for a while that was for multiple sites.

Page 20

1   We could get from births around the country the same
2   thing, so on.
3             And then -- so that's a count of the baby,
4   the baby with a birth defect.  And one of its
5   disadvantages is not cerebral palsy or other things.
6   It's just birth defects.  Not cancer, not heart
7   attack.  Birth defects.  But it allows you the
8   opportunity, depending upon how well you can assess
9   the exposure, to look at essentially an infinite
10  number of exposures.
11            And so since there were, you know, 100,000
12  environment of chemicals that presumably haven't been
13  tested and no drug is marketed that's been given to
14  pregnant women and yet pregnant women get -- I mean
15  women of reproductive age get pregnant.  It's a
16  reasonable way to try to look at whether drugs would
17  cause a birth defect.
18            So the first obligation was to count and
19  see if it went up, down, sideways.  And we did that.
20  And then --
21       Q.    You're saying we did that.
22            You did that in connection with a
23  particular registry you're talking about?
24       A.    The one I directed in Atlanta for a while,
25  the Metropolitan Atlanta Congenital Defects Program.



GODFREY P. OAKLEY, JR., M.D.
D.W.K. vs. ABBOTT LABORATORIES, INC.,

October 16, 2014
65–68

Page 65

1   Q.   Have you ever expressed to FDA in any
2   memorialized way your view that every drug that's
3   going to be -- going to result in pregnancy exposures
4   should have a registry upon launch?
5   A.   I don't have any recollection of doing
6   that, although there's still some generic papers I've
7   written I haven't read -- reread to find out if I did
8   say that once.
9   Q.   Okay. When you had this conversation
10  with -- is it Roche about Valium?
11  A.   It was Roche, yes.
12  Q.   Did you tell them at the time, hey, what
13  are you doing, you need a registry?
14  A.   I don't remember. Probably not.
15  Q.   Is there a -- if you haven't said it in
16  writing, are you aware of anybody else of similar
17  high reputation to yours having said, hey, we've got
18  to have this?
19  A.   Say again.
20  Q.   Has anybody else in any published way said
21  it is necessary and appropriate and required --
22  should be required for all drug companies to launch
23  pregnancy registries at the same time they launch
24  products that are going to be prescribed to women of
25  child-bearing age?

Page 66

1   A.   What I took this Burroughs Wellcome paper
2   to say was that Burroughs Wellcome thought that it
3   was their corporate responsibility to set up such a
4   registry, and they did that. And it seems to me if
5   it was reasonable for Burroughs Wellcome to do that
6   it would be reasonable for other companies that are
7   going to have a product on the market that they know
8   women of reproductive age are going to be taking and
9   therefore pregnancies will occur.
10  Q.   Acyclovir is what kind of product, Doctor?
11  A.   It's a drug to treat a viral infection, I
12  think.
13  Q.   Okay. It's not used for any indication
14  that is -- for which valproate is indicated, correct?
15  In laymen's terms, there's no overlap between
16  acyclovir and Depakote, right?
17  A.   You mean as drugs?
18  Q.   Yes, sir, what they're prescribed for.
19  A.   Might be prescribed to the same woman.
20  Same woman might have two things.
21      That's why I couldn't quite figure out
22  what you're asking.
23  Q.   There's no reason why a doctor would be
24  considering I've got this patient with this
25  condition, should I put her on acyclovir or put her

Page 67

1   on Depakote? That doesn't happen?
2   A.   I think that's a fair statement.
3   Q.   And, again, I'm not smart enough to
4   be tricky. So I'm just trying to get us a common
5   lexicon here.
6       If Burroughs Wellcome did it for
7   acyclovir, how many other products -- do they
8   mention -- I haven't had the opportunity to go over
9   Exhibit 3 to the extent you have.
10      Does it talk about whether they're going
11  to do that in every case?
12  A.   I don't remember seeing that; but, again,
13  I went through it pretty fast.
14  Q.   How many drugs -- Burroughs Wellcome isn't
15  around anymore in that -- as that name, right? Do
16  you know who they are these days?
17  A.   I don't really know frankly.
18  Q.   Okay. Me neither.
19      Do you know whether Burroughs Wellcome at
20  the time had a roster of other drugs that were
21  prescribed for women of child-bearing age?
22  A.   I don't know.
23  Q.   Recognizing that you only looked through
24  this article briefly in the last few days, have you
25  explored whether Burroughs Wellcome or its successor

Page 68

1   actually did this same setup for any other drug?
2   A.   I haven't looked at that.
3   Q.   Are you aware of any -- pardon me while I
4   look to see when this was published.
5   A.   I think it's '84. It's '88 but it started
6   in '84.
7   Q.   That's what I was going to get at.
8       So the publication is '88. It's referring
9   back to a registry that the inception of which was
10  '84.
11      Are you aware of any published follow-up
12  to this '88 article?
13  A.   No.
14  Q.   So we don't know sitting here today
15  whether it worked, didn't work, how long it took, how
16  many cases they ever got, that sort of thing?
17  A.   It may be known.
18      I frankly just found this this morning.
19  So I didn't follow it up, no.
20  Q.   Okay.
21  A.   But I thought one of the issues was was it
22  possible to do this in this time frame. And I think
23  this clearly demonstrates it's possible to do it.
24  That's what struck my eye when I saw it. There's no
25  question this could be done and just as, I think,

