# EXHIBIT 5

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF ILLINOIS
 2
 3   IN RE DEPAKOTE: RHEALYN         )
     ALEXANDER, et al.,              )
 4                                   ) Case No.
              Plaintiffs,            ) 12-52-NJR-SCW
 5                                   )
     v.                              ) LEAD CONSOLIDATED
 6                                   ) CASE
     ABBOTT LABORATORIES INC.,       )
 7                                   )
              Defendants.            )
 8   _____)
 9
10
11
12
13          DEPOSITION OF AL C. EDWARDS, M.D.
14              Monday, October 3, 2016
15              Greenville, South Carolina
16                    8:59 a.m.
17
18
19
20
21
22   REPORTED BY:  Karen K. Kidwell, RMR, CRR
23
24             GOLKOW TECHNOLOGIES, INC.
           877.370.3377 ph | 917.591.5672 fax
25                  deps@golkow.com
```

1    Q.   Okay.  And so what was your treatment plan
2    for Ms. Burnett at this visit on March 10th, 1999?
3    A.   Given her past history, and Clozaril in of
4    itself can have some risks, just like a lot of other
5    drugs to pregnant women, at least I thought the
6    risk-benefit ratio, that this was a lady that had
7    been, you know, pretty severely ill at times and
8    tried to chase people with butcher knives and tried
9    to commit suicide and things like that so I thought
10   the risk-benefit kind of weighed to the fact that
11   keep her on the Clozaril.  So that's what we did.
12   Q.   Okay.  But you did not continue her on or
13   start her again on Depakote?
14   A.   No.
15   Q.   Okay.  All right.  Then one more record
16   I'd like to look at is 125.
17   A.   Okay.
18   Q.   Is this your note of a May 12th, 1999
19   visit by Ms. Burnett?
20   A.   Yes.
21   Q.   "We discussed at length this current
22   pregnancy problems with the baby, spina bifida,
23   hydrocephalus and possible other problems"?
24   A.   Right.
25   Q.   Did you see where I read that?

```
 1                THE WITNESS:  No.
 2     BY MS. WILLIAMSON:
 3          Q.    And, Doctor, we've established that you
 4     recommended that Ms. Burnett take Depakote in 1999
 5     for possible seizure disorder, correct?
 6          A.    And it was being utilized as a mood
 7     stabilizer as well and she had a history of
 8     schizoaffective illness so it also may provide some
 9     adjunctive treatment in that area.
10          Q.    Was your decision to prescribe Depakote in
11     to Ms. Burnett in 1999 based upon your belief that
12     the benefits of the drug outweighed the risks based
13     on the information provided to you at the time?
14          A.    Yes.
15          Q.    And, Doctor, you were treating Ms. Burnett
16     with Depakote, not a baby, correct?
17          A.    Correct.
18          Q.    Okay.  Do you have any independent
19     recollection of any conversations you had with
20     Ms. Burnett concerning any antiepileptic drug?
21          A.    Other than what's in the record, I don't
22     have any -- really recollection of conversations like
23     that.
24          Q.    17 years ago?
25          A.    Yeah.
```

 1   how she responded to those medications, would be a
 2   significant factor in terms of what other possible
 3   treatment options might have been available to you in
 4   January 1999?
 5        A.   It could have been.  You know, I mean,
 6   obviously, she could have been treated for a seizure
 7   disorder with Dilantin or Phenobarbital or whatever.
 8   Those drugs, although they would -- they might
 9   address some of the issues she was having, they
10   haven't -- they hadn't really been used in the
11   affective component of people's illness that I'm --
12   with any success.  Tegretol may be a little bit --
13   there was some people -- some people that used
14   Tegretol with a -- almost as a dual purpose, but it
15   actually turned out not to be so helpful.
16        Q.   All right.  Let me ask you this:  Do
17   you -- you stand behind your decision to prescribe
18   Depakote for Ms. Burnett's --
19        A.   I think it was -- I think it was a good
20   choice for her illness.  She wasn't pregnant when we
21   started the drug.  Unfortunately, she got pregnant.
22             I -- and the baby had -- evidently, you
23   know, had a neural tube defect.  And that's a bad
24   thing.  And this lady was a nice lady.  And it was an
25   unfortunate thing.

1       It's unfortunately that she became pregnant.
2       That's an unfortunate thing.  She was one of the
3       few people that took -- actually was a fairly
4       low dose of Depakote and ended up with a baby
5       with this problem.
6            If the risk to her fetus had been
7       50 percent, 25 percent as opposed to 1 percent,
8       could that have influenced my decision to
9       prescribe Depakote to her?  Yes, it could have.
10      Would it absolutely have done that?  Maybe not.
11  BY MR. EVANS:
12      Q.   Fair to say you just don't know as you sit
13  here today whether or not it would have -- it would
14  have -- it would have changed your decision to
15  prescribe or not?
16      A.   I do not know that.
17      Q.   Okay.  All right.  And I think as you told
18  us, in reality for Ms. Burnett in terms of the
19  drilling down on the reason you were prescribing
20  Depakote for her, and there was these two-fold
21  reasons, right?
22      A.   Correct.
23      Q.   There was the seizure disorder and then
24  there was also the schizoaffective disorder, right?
25      A.   That's correct.

```
 1         Q.   I mean, there -- the reality is that she
 2   needed treatment, correct?
 3         A.   Yes.
 4         Q.   Okay.  And Depakote may very well have
 5   been the only reasonable treatment for her condition
 6   at that time?
 7              MS. WILLIAMSON:  Object to the form.
 8        Leading.  Asked and answered.
 9              THE WITNESS:  It was one that seemed to be
10        a more simple regimen and has potential benefit.
11        I mean, whether one could construct a different
12        treatment regimen to come out with the same
13        result, it would have been more complex and
14        maybe just as risky.
15   BY MR. EVANS:
16         Q.   Certainly as you sit here right now, you
17   can't say that there was another, you know, treatment
18   regimen that you thought was a more reasonable
19   treatment regimen than the Depakote?
20              MS. WILLIAMSON:  Object to form.  Asked
21         and answered.  Mischaracterizes prior testimony.
22              THE WITNESS:  That's right.
23   BY MR. EVANS:
24         Q.   All right, Doctor.  Let's run through some
25   records with you.
```

1           Q.    Okay.

2           A.    And so --

3           Q.    Let me ask you this:  Did you have an

4    understanding, Doctor, of the -- in 1999, do you

5    believe you had an understanding of the comparative

6    risks between Depakote and other AED medications?

7                 MS. WILLIAMSON:  Object to the form.

8         Vague.

9                 THE WITNESS:  I probably knew some -- may

10        have had an understanding of some of the risks.

11        But none of the other medications, except maybe

12        just some anecdotal case reports with Tegretol,

13        had really showed any efficacy in what I was

14        giving it to her for.

15   BY MR. EVANS:

16          Q.    Okay.  Oh, yeah, okay.  So I see what

17   you're saying.  So just in terms of, you know,

18   potential -- even potential treatments from an

19   efficacy standpoint, Tegretol was the only one that

20   might have shown any potential efficacy?

21                MS. WILLIAMSON:  Object to form.

22        Mischaracterizes his testimony.

23   BY MR. EVANS:

24          Q.    Is that -- okay.

25          A.    Right.

Al C. Edwards, M.D.

```
 1                CERTIFICATE OF REPORTER
 2          I, Karen K. Kidwell, Registered Merit
    Reporter and Notary Public for the State of South
 3  Carolina at Large, do hereby certify:
            That the foregoing deposition was taken
 4  before me on the date and at the time and location
    stated on page 1 of this transcript; that the
 5  deponent was duly sworn to testify to the truth, the
    whole truth and nothing but the truth; that the
 6  testimony of the deponent and all objections made at
    the time of the examination were recorded
 7  stenographically by me and were thereafter
    transcribed; that the foregoing deposition as typed
 8  is a true, accurate and complete record of the
    testimony of the deponent and of all objections made
 9  at the time of the examination to the best of my
    ability.
10          I further certify that I am neither related
    to nor counsel for any party to the cause pending or
11  interested in the events thereof.
12          Witness my hand this 10th day of October, 2016.
13
14
                    _____
15                  Karen K. Kidwell,
                    Registered Merit Reporter
16                  Notary Public
                    State of South Carolina at Large
17                  My Commission expires:
                    August 21, 2024
18
19
20
21
22
23
24
25
```